JS-44 - js_044.pdf    https://www.uscourts.gov/sites/default/files/js_044.pdf

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Frazier, Denise; Frazier, Shawn | Golden Rule Insurance Company |

| (b) County of Residence of First Listed Plaintiff **Hamilton**<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant **Marion**<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
|---|---|
| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br>Michael L. Gay, CORS & BASSETT, LLC, 201 E. Fifth<br>Street, Suite 900, Cincinnati, OH 45202 (513) 852-8203 | Attorneys *(If Known)*<br>Unknown |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [x] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle / [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | Product Liability / [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | **IMMIGRATION** | | |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S. Code §1332

Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 300,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE **12-20-22**    SIGNATURE OF ATTORNEY OF RECORD *(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

Michael L. Gay [0024579]
**Attorney for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **DENISE FRAZIER** | : | Case No. |
| **7517 Brooks Road** | | |
| **Harrison, Ohio 45030-8552** | : | Judge |
| and | : | |
| **SHAWN FRAZIER** | : | |
| **7517 Brooks Road** | | |
| **Harrison, Ohio 45030-8552** | : | |
| Plaintiffs, | : | |
| v. | : | |
| **GOLDEN RULE INSURANCE COMPANY** | : | **COMPLAINT AND JURY DEMAND** |
| **7440 Woodland Drive** | | |
| **Indianapolis, Indiana 46278** | : | |
| Defendant. | : | |

Now come the Plaintiffs, by and through counsel, and states for their Complaint as follows:

1. Plaintiffs, **Denise Frazier** (hereinafter "**Denise**") and **Shawn Frazier** (hereinafter "**Shawn**"), are husband and wife, and residents of Hamilton County, Ohio.

2. Defendant, **Golden Rule Insurance Company** (hereinafter "**Golden Rule**"), is an Indiana corporation with its principal place of business in the State of Indiana.

3. The amount in controversy in this action exceeds $75,000.00.

4. Defendant **Golden Rule** issued a health insurance policy to Plaintiffs, a copy of a portion of the policy which is attached hereto as Exhibit "A". Plaintiffs are not in possession of a full copy of the policy.

- 1 -

5.     The Golden Rule Agreement and Consideration documents is attached hereto as Exhibit "B".

6.     Plaintiffs have routinely paid all premiums due under the health insurance contract.

7.     Plaintiffs have incurred medical expenses approximating $300,000.00 to date, which amount is ongoing for medical care rendered to **Denise** as a result of a medical condition.

8.     Defendant **Golden Rule** denied coverage for **Denise's** medical expenses claiming that she had a pre-existing condition which was not disclosed on the insurance application, and which pre-existing condition was directly related to her current medical condition.

9.     **Denise's** current medical condition was not a known pre-existing condition at the time of the application for health insurance.

10.    **Golden Rule** breached the contract by failing to pay Plaintiffs' medical expenses.

11.    Plaintiffs state that the health insurance application was truthfully and fully completed, and Defendant's allegation of an improperly prepared application is simply a pretext to deny health benefits.

12.    Defendant issued a letter dated June 10, 2022, documenting the denial of health benefits. It is attached hereto as Exhibit "C".

13.    Plaintiffs filed an internal appeal on June 24, 2022, and Defendant issued a decision on August 23, 2022, affirming the original determination to void Plaintiffs' health insurance coverage. It is attached hereto as Exhibit "D".

14.     Shortly thereafter Defendant forwarded to Plaintiffs a draft representing the refund of all premiums paid, and endorsement language requiring Plaintiffs to release their claims for the Defendant's bad faith handling of this claim.

15.     Defendant, as an insurer, has a duty of good faith to their insureds, which good faith duty has been breached by its failure to honor its contractual obligations.

**WHEREFORE**, Plaintiffs demand judgment against the Defendant in the amount it is obligated to pay pursuant to the policy for medical expenses incurred to date, as well as additional amounts which will be incurred in the future, as well as their attorney's fees and punitive damages for the reasons set forth herein

Respectfully submitted,

Michael L. Gay                    [0024579]
CORS & BASSETT, LLC
PNC Center, 201 East Fifth Street, Suite 900
Cincinnati, Ohio 45202
Phone: (513) 852-8203
Fax:    (513) 852-8222
E-mail: mlg@corsbassett.com
**Attorney for Plaintiffs**

### JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues herein.

Michael L. Gay                    [0024579]
**Attorney for Plaintiffs**

## SECTION 2
## DEFINITIONS

In the *policy*/certificate, *italicized* words are defined. Words not *italicized* will be given their ordinary meaning.

Wherever used in this the *policy*/certificate:

*"Accident"* or *"accidental"* means an unintended or unforeseeable event that occurs while this *policy* is in force and that is not excluded in the General Exclusions and Limitations section of this the *policy*/certificate.

*"Applied behavioral analysis"* means the design implementation, and evaluation of environmental modifications using behavioral stimuli and consequences to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relations between environment and behavior.

*"Autism spectrum disorder"* means pervasive developmental disorders as defined in the most recent edition of the Diagnostic and Statistical manual of Mental Disorders.

*"Children's preventive health care services"* means services which are:

A. Ordered, delivered, or supervised by a *doctor;*

B. Limited to a medical history, physical examination, developmental assessment, anticipatory guidance, and appropriate immunizations and laboratory tests, which are all in keeping with prevailing medical standards; and

C. Provided during periodic preventive care visits.

*Children's preventive health care services* are limited to the following:

A. One visit at each of the following (approximate) age intervals: birth, 2 weeks, 2 months, 4 months, 6 months, 9 months, 12 months, 15 months, 18 months, 2 years, 3 years, 4 years, 5 years, 6 years, 8 years, 10 years, 12 years, 14 years, 16 years and 18 years; and

B. The services of one *doctor* for all of the services provided at each visit shown in (A) above.

*"Coinsurance percentage"* means the percentage of *covered expenses* that a *covered person* must pay after the applicable *deductible amount* or *copayment amount* has been met.

*"Complications of pregnancy"* means conditions whose diagnoses are distinct from pregnancy, but are adversely affected by pregnancy or are caused by pregnancy and not, from a medical viewpoint, associated with a normal pregnancy. This includes:

A. Ectopic pregnancy, spontaneous abortion, severe preeclampsia, eclampsia, missed abortion, and similar medical and surgical conditions of similar severity.

B. *Hospital* confinement required to treat the following: acute nephritis, nephrosis, cardiac decompensation, HELLP syndrome, uterine rupture, amniotic fluid embolism, chorioamnionitis, fatty liver in pregnancy, septic abortion, placenta accreta, gestational hypertension, puerperal sepsis, peripartum cardiomyopathy, cholestasis in pregnancy, thrombocytopenia in pregnancy, placenta previa, placental abruption, acute cholecystitis and pancreatitis in pregnancy, postpartum hemorrhage, septic pelvic thromboplebitis, retained placenta, venous air embolus associated with pregnancy, miscarriage, or an emergency caesarean section required because of: (1) fetal or maternal distress during labor, (2) severe pre-eclampsia, (3) arrest of descent or dilatation, (4) obstruction of the birth canal by fibroids or ovarian tumors; or (5) the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity that, in the absence of immediate medical attention, will result in placing the life of the mother or fetus in jeopardy.

C. Treatment, diagnosis or care for conditions, including the following, in a pregnant female, when the condition was caused by, necessary because of, or was aggravated by the pregnancy: hyperthyroidism; hepatitis B or C; HIV: human papilloma virus; abnormal Pap; syphilis; chlamydia; herpes; urinary tract infections; thromboembolism; appendicitis; hypothyroidism; pulmonary embolism; sickle cell disease; tuberculosis; migraine headaches; depression; acute myocarditis; asthma; maternal cytomegalovirus; urolithiasis; DVT prophylaxis; ovarian dermoid tumors, biliary atresia and/or cirrhosis, first trimester adnexal mass; hyditiform mole; or ectopic pregnancy.

D. An *emergency* or *non-elective caesarean section.* A Caesarean section is not considered to be an *emergency* if it is for the convenience of a patient or *doctor* or if it is performed solely because a previous pregnancy resulted in a caesarean section.

*Complications of pregnancy* does not include: false labor, mild preeclampsia, edema, prolonged labor, *doctor* prescribed rest during the period of pregnancy, morning sickness, and conditions of similar severity associated with management of a difficult pregnancy, and not constituting a medically classifiable distinct complication of pregnancy.

"*Copayment amount*" means the amount of *covered expenses* that must be paid by a *covered person* for each service that is subject to a *copayment amount* (as shown in Section 1), before benefits are payable for remaining *covered expenses* for that service under this *policy*/certificate.

"*Cosmetic treatment*" means treatments, procedures or services that change or improve appearance without significantly improving physiological function and without regard to any asserted improvement to the psychological consequences or socially avoidant behavior resulting from an *injury, illness* or an anomaly present at birth.

"*Covered expense*" means an expense that is:

A. Incurred while *you* or *your dependent's* insurance is in force under the *policy;*

B. Provided for the purpose of evaluating, diagnosing, testing, or treating an *illness* or *injury;*

C. Covered by a specific benefit provision of the *policy; and*

D. Not excluded anywhere in the *policy.*

"*Covered person*" means *you, your* lawful *spouse,* and each *eligible child* named in the application and not excluded by *us.* A *covered person* must not have reached his or her 65th birthday.

"*Custodial care*" means care which is administered for assistance (rather than for training or education) of the patient in performing the activities of daily living. *Custodial care* also includes non-acute care for a patient who is comatose, semi-comatose, paralyzed or mentally incompetent.

"*Deductible amount*" means the amount of *eligible expenses,* as shown in the Data Page, for which each *covered person* is responsible before any

benefits are payable. The *deductible amount* does not include any *copayment amount.*

"*Dental expenses*" means *surgery* or services provided to diagnose, prevent, or correct any ailments or defects of the teeth and supporting tissue and any related supplies or oral appliances. Expenses for such treatment are considered *dental expenses* regardless of the reason for the services.

"*Dependent*" means: (A) *your* lawful *spouse;* or (B) an *eligible child.*

"*Diabetes*" includes Type 1, Type 2, or gestational diabetes, diabetes insipidus, and other specific types of diabetes mellitus.

"*Diabetes self-management training*" means instruction in an *inpatient* or outpatient setting, including medical nutrition therapy, but excluding programs the primary purposes of which are weight reduction, which enables diabetic patients to understand the diabetic management process and daily management of diabetic therapy as a method of avoiding frequent hospitalizations and complications, when the instruction is provided in accordance with a program in compliance with the National Standards of Diabetes Self-management Education Program as developed by the American Diabetes Association.

"*Diagnosis of autism spectrum disorder*" means one or more tests, evaluations, or assessments prescribed, performed or ordered by a *doctor* to diagnose whether an individual has *autism spectrum disorder.*

"*Distant site*" means the location of the *medical practitioner* delivering services through *telemedicine* at the time the services are provided.

"*Doctor*" means a duly licensed practitioner of the medical arts, limited to a physician holding an M.D. or D.O. degree, optometrist, dentist, podiatrist, chiropractor, or clinical psychologist. With regard to medical services provided to a *covered person, a doctor* must be currently licensed by the state in which the services are provided, and the services must be provided within the scope of that license. With regard to consulting services provided to *us,* a *doctor* must be currently licensed in at least one state of the United States of America.

"*Durable medical equipment*" means items that:

A. Are used to serve a specific diagnostic or therapeutic purpose in the treatment of an *illness* or *injury;*

B. Can withstand repeated use;

C. Are generally not useful to a person in the absence of *illness* or *injury;* and

D. Are appropriate for use in the patient's home.

*"Effective date"* means the applicable date a *covered person* becomes insured for *illness* or *injury* under the *policy.* The applicable *effective date* for initial *covered persons* is shown in the Data Page.

*"Eligible child"* means *your* or *your spouse's* child, if that child is not married and under 26 years of age.

As used in this definition, "child" means:

A. A natural child;

B. A legally adopted child;

C. A child placed with *you* for adoption; or

D. A child for whom legal guardianship has been awarded to *you* or *your spouse.*

*"Eligible expense"* means a *covered expense* as determined below:

A. For *network providers*: When a *covered expense* is received from a *network provider*, the *eligible expense* is the contracted fee with that provider.

B. For non-*network providers:*

1. When a *covered expense* is received from a non-*network provider* as a result of an *emergency*, the *eligible expense* is a rate agreed upon by *us* and the non-*network provider* or a rate determined based upon the higher of:

   a. The median amount negotiated with *network providers* for the same service; or

   b. 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (*CMS*) for the same or similar services within the geographic market.

2. For non-*emergency covered expenses* received at a *network* facility from a non-*network* facility-based physician, the *eligible expense* is based on 110% of the published rates allowed by *CMS* for the same or similar service within the geographic market with the exception of the following:

a. 50% of the published rates allowed by *CMS* for the same or similar laboratory service.

b. 45% of the published rates allowed by *CMS* for the same or similar *durable medical equipment*, or *CMS* competitive bid rates.

When a rate is not published by *CMS* for the service:

a. A gap methodology will be applied that uses a relative value scale, which is usually based on the difficulty, time, work, risk, and resources of the service. The relative value scale currently used is created by OptumInsight. If the OptumInsight relative value scale becomes no longer available, a comparable scale will be used. *We* and OptumInsight are related companies through common ownership by UnitedHealth Group.

b. For pharmaceutical products, gap methodologies are applied that are similar to the pricing methodology used by *CMS*, and produce fees based on published acquisition costs or average wholesale price for the pharmaceuticals. These methodologies are currently created by RJ Health Systems, Thomson Reuters (published in its Red Book), or UnitedHealthcare based on an internally developed pharmaceutical pricing resource.

c. If a gap methodology does not apply to the service, or the provider does not submit sufficient information on the claim to pay it under the *CMS* published rates or a gap methodology, the *eligible expense* is based on 50% of the provider's billed charge.

3. Except as provided under B.1 and B.2 above, when a *covered expense* is received from a non-*network provider,* the *eligible expense* is determined based on the first of the following rules that can be applied in the order shown below:

   a. The fee that has been negotiated with the provider.

   b. 110% of the fee Medicare allows for the same or similar services

provided in the same geographical area.

c. The fee established based on rates from one or more regional or national databases or schedules for the same or similar services from a geographical area determined by *us*.

d. A fee based on a gap methodology that uses a relative value scale, which is usually based on the difficulty, time, work, risk, and resources of the service. The relative value scale currently used is created by OptumInsight. If the OptumInsight relative value scale becomes no longer available, a comparable scale will be used. *We* and OptumInsight are related companies through common ownership by UnitedHealth Group:

i. For pharmaceutical products, gap methodologies are applied that are similar to the pricing methodology used by *CMS* and produce fees based on published acquisition costs or average wholesale price for the pharmaceuticals. These methodologies are currently created by RJ Health Systems, Thomson Reuters (published in its Red Book), or UnitedHealthcare based on an internally developed pharmaceutical pricing resource.

ii. When a rate is not published by *CMS* for the service and a gap methodology does not apply to the service, or the provider does not submit sufficient information on the claim to pay it under the *CMS* published rates or a gap methodology, the *eligible expense* is based on 50% of the provider's billed charge.

e. The fee charged by the provider for the services.

f. A fee schedule that *we* develop.

**IMPORTANT NOTE:** Except when the *eligible expense* is an amount negotiated with the provider, non-*network providers* and non-*network* facility-based physicians may bill *you* for any difference between the billed charges and the *eligible expense*.

*"Emergency"* means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in:

A. Placing the health of the *covered person* (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;

B. Serious impairment to bodily functions; or

C. Serious dysfunction of any bodily organ or part.

*"Evidence-based treatment"* means treatment subject to research that applies rigorous, systematic, and objective procedures to obtain valid knowledge relevant to *autism spectrum disorders* and shall include any equipment determined necessary to provide the treatment.

*"Experimental or investigational treatment"* means medical, surgical, diagnostic or other health care services, treatments, procedures, technologies, supplies, devices, drug therapies or medications that, after consultation with a medical professional, *we* determine to be one or more of the following:

A. Under study in an ongoing phase I or II clinical trial as set forth in the United States Food and Drug Administration (*"USFDA"*) regulation, whether or not the trial is subject to *USFDA* oversight.

B. An *unproven service*.

C. Subject to *USFDA* approval, and:

1. It does not have *USFDA* approval;

2. It has *USFDA* approval only under its Treatment Investigational New Drug regulation or a similar regulation; or

3. It has *USFDA* approval, but is being used for a use or at a dosage that is not an accepted off-label use. An accepted off-label use of a *USFDA*-approved drug is a use that is:

a. Included in authoritative compendia as identified from time to time by the Secretary of Health and Human Services;

b. Safe and effective for the proposed use based on supportive clinical

evidence in peer-reviewed medical publications; or

    c.  Not an *unproven service*; or

4.  It has *USFDA* approval, but is being used for a use, or to treat a condition, that is not listed on the Premarket Approval issued by the *USFDA* or has not been determined through peer-reviewed medical literature to treat the medical condition of the *covered person*.

D.  Experimental or investigational according to the provider's research protocols.

Items C and D above do not apply to phase III or IV *USFDA* clinical trials.

"*Gastric pacemaker*" means a medical device that:

A.  Uses an external programmer and implanted electrical leads to the stomach; and

B.  Transmits low-frequency, high-energy electrical stimulation to the stomach to entrain and pace the gastric slow waves to treat gastroparesis.

"*Hospital*" means an institution that:

A.  Operates as a *hospital* pursuant to law;

B.  Operates primarily for the reception, care, and treatment of sick or injured persons as *inpatients*;

C.  Provides 24-hour nursing service by registered nurses on duty or call;

D.  Has a staff of one or more *doctors* available at all times;

E.  Provides organized facilities and equipment for diagnosis and treatment of acute medical, surgical, or mental conditions either on its premises or in facilities available to it on a prearranged basis; and

F.  Is not primarily a long-term care facility; an *extended care facility,* nursing, rest, *custodial care,* or convalescent home; a place for the aged, drug addicts, alcoholics, or runaways; or a similar establishment.

While confined in a separate identifiable *hospital* unit, section, or ward used primarily as a nursing, rest, *custodial care* or convalescent home, or *extended care facility,* a *covered person* will be deemed not to be confined in a *hospital* for purposes of the *policy*/certificate.

"*Illness*" means a sickness, disease, disorder, or abnormal condition of a *covered person*. *Illness* does not include pregnancy, learning disabilities, attitudinal disorders, or disciplinary problems. All *illnesses* that exist at the same time and which are due to the same or related causes are deemed to be one *illness*. Further, if an *illness* is due to causes that are the same as, or related to, the causes of a prior *illness,* the *illness* will be deemed a continuation or recurrence of the prior *illness* and not a separate *illness*.

"*Immediate family*" means the parents, *spouse,* children, or siblings of any *covered person,* or any person residing with a *covered person*.

"*Injury*" means *accidental* bodily damage sustained by a *covered person*. All *injuries* due to the same *accident* are deemed to be one *injury*.

"*Inpatient*" means that medical services, supplies, or treatment are received by a *covered person* who is an overnight resident patient of a *hospital* or other facility, using and being charged for room and board.

"*Intensive care unit*" means a Cardiac Care Unit or other unit or area of a *hospital* that meets the required standards of the Joint Commission on Accreditation of Hospitals for Special Care Units.

"*Loss*" means an event for which benefits are eligible for payment under the *policy*. A *loss* must occur while the *covered person* is insured under this *certificate*.

"*Medical disorders requiring specialized nutrients or formulas*" means the following:

A.  Nitrogen metabolism disorder;

B.  Phenylketonuria;

C.  Maple syrup urine disease;

D.  Homocystinuria;

E.  Citrullinemia;

F.  Argininosuccinic acidemia;

G.  Tyrosinemia, type 1;

H.  Very-long-chain acyl-CoA dehydrogenase deficiency;

I.  Long-chain 3-hydroxyacyl-CoA dehydrogenase deficiency;

J.  Trifunctional protein deficiency;

K.  Glutaric acidemia, type 1;

L.  3-methylcrotonyl CoA carboxylase deficiency;

M.  Propionic acidemia;

N.  Methylmalonic acidemia due to mutase deficiency;

O.  Methylmalonic acidemia due to cobalamin A, B defect;

P.  Isovaleric acidemia;

Q.  Ornithine transcarbamylase deficiency;

R.  Non-ketotic hyperglycinemia;

S.  Glycogen storage diseases;

T.  Disorders of creatine metabolism;

U.  Malonic aciduria;

V.  Carnitine palmitoyl transferase deficiency, type II

W.  Glutaric aciduria type II; and

X.  Sulfite oxidase deficiency.

*"Medical foods"* shall include:

A.  Low protein modified food products;

B.  Amino acid-based elemental formulas;

C.  Extensively hydrolyzed protein formulas;

D.  Formulas with modified vitamin or mineral content; and

E.  Modified nutrient content formulas.

*"Medical practitioner"* means a *doctor,* nurse anesthetist, physician's assistant, physical therapist, speech therapist, audiologist, or midwife, or certified mechanotherapist, as defined under Ohio law. The following are examples of providers that are not *medical practitioners,* by definition of the *policy:* acupuncturist, occupational therapist, rolfer, registered nurse, hypnotist, respiratory therapist, X-ray technician, emergency medical technician, social worker, family counselor, marriage counselor, child counselor, naturopath, perfusionist, massage therapist, or sociologist. With regard to medical services provided to a *covered person,* a *medical practitioner* must be licensed or certified by the state in which care is rendered and performing services within the scope of that license or certification. With regard to consulting services provided to *us,* a *medical practitioner* must be licensed or certified by the state in which the consulting services are provided.

*"Medically necessary"* means a treatment, test, procedure or confinement that is necessary and appropriate for the diagnosis or treatment of an *illness* or *injury.* This determination will be made by *us* based on *our* consultation with an appropriate medical professional. A treatment, test, procedure or confinement will not be considered *medically necessary* if:

A.  It is provided only as a convenience to the *covered person* or provider;

B.  It is not appropriate for the *covered person's* diagnosis or symptoms; or

C.  It exceeds (in scope, duration, or intensity) that level of care that is needed to provide safe, adequate, and appropriate diagnosis or treatment to the *covered person.*

The fact that any particular *doctor* may prescribe, order, recommend, or approve a treatment, test, procedure, or confinement does not, of itself, make the treatment, test, procedure or confinement *medically necessary.*

*"Mental disorder"* means a mental or emotional disease or disorder that is:

A.  A disease of the brain with predominant behavioral symptoms;

B.  A disease of the mind or personality, evidenced by abnormal behavior; or

C.  A disorder of conduct evidenced by socially deviant behavior.

*Mental disorder* includes psychiatric *illnesses* listed in the current edition of the <u>Diagnostic and Statistical Manual of Mental Disorders</u> of the American Psychiatric Association.

*"Necessary medical supplies"* means medical supplies that are:

A.  Necessary to the care or treatment of an *injury* or *illness;*

B.  Not reusable or *durable medical equipment;* and

C.  Not able to be used by others.

*Necessary medical supplies* do not include first aid supplies, cotton balls, rubbing alcohol, or like items commonly found in the home.

*"Network"* means a group of *doctors* and providers who have contracts with *us* or *our* affiliates that include an agreed upon price for health care expenses that are *covered expenses* under the *policy/*certificate.

*"Network eligible expense"* means the *eligible expense* for services or supplies that are provided

by a *network provider*. For facility services, this is the *eligible expense* that is provided at and billed by a *network* facility for the services of either a *network* or non-*network provider*. *Network eligible expense* includes benefits for *emergency* health services even if not provided by a *network provider*.

"*Network provider*" means a *doctor*, provider or member pharmacy who is identified in the most current list for the *network* shown on *your* health insurance identification card.

"*Non-elective caesarean section*" means a caesarean section where vaginal delivery is not a medically viable option.

"*Non-network eligible expense*" means the *eligible expense* for services or supplies that are provided and billed by a non-*network provider*.

"*Originating site*" means a site at which a patient is located at the time healthcare services are provided to him or her by means of *telemedicine.*

"*Outpatient surgical facility*" means any facility with a medical staff of *doctors* which operates pursuant to law for the purpose of performing *surgical procedures;* and which does not provide accommodations for patients to stay overnight. This does not include facilities such as: acute-care clinics, urgent-care clinics, ambulatory care clinics, urgecenters, free-standing emergency facilities and *doctor* offices.

"*Periodic preventive care visits*" means the routine tests and procedures for the purpose of detection of abnormalities or malfunctions of bodily systems and parts according to accepted medical practice.

"*Policy,*" when italicized, means the master policy issued and delivered to the *policyholder.* It includes the attached pages, the applications, and any amendments.

"*Policyholder*" means the entity shown as the *policyholder* on the Data Page of the *policy* and certificate.

"*Policy term*" means the period that this certificate is to be in force is a maximum of 364 days. The *policy term* cannot be extended.

"*Preexisting condition*" means:

    A. Any *illness, injury* or condition for which medical advice, care, treatment, any diagnostic procedure(s), or further evaluation was recommended or received

within the 24 months immediately preceding the *covered person's effective date;* or

    B. Any *illness, injury* or condition for which any diagnostic procedure or screening was recommended to or received by a *covered person* within the 12 months immediately preceding the *covered person's effective date* that results in medical care or treatment after the *covered person's effective date*; or

    C. Any *illness, injury*, condition, or symptom(s) that, in the opinion of a *doctor*, manifested itself in a manner that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care, treatment or further evaluation within the 12 months immediately preceding the *covered person's effective date*; or

    D. A pregnancy existing on the *effective date* of coverage.

"*Primary insured*" means a member who satisfies the eligibility requirements of the *policy,* and who is identified as the primary insured on the front of the certificate.

"*Proof of loss*" means information required by *us* to decide if a claim is payable and the amount that is payable. It includes, but is not limited to, claim forms, medical bills or records, other plan information, and network repricing information. *Proof of loss* must include a copy of all Explanation of Benefit forms from any other insurance, including Medicare.

"*Reconstructive surgery*" means *surgery* performed on an abnormal body structure caused by birth defects, developmental abnormalities, trauma, infection, tumors, or disease in order to improve function or to improve the patient's appearance, to the extent possible.

"*Remote patient monitoring*" means the use of synchronous or asynchronous electronic information and communication technology to collect personal health information and medical data from a patient at an *originating site* that is transmitted to a *medical practitioner* at a *distant site* for use in the treatment and management of medical conditions that require frequent monitoring.

"*Residence*" means the physical location where *you* live. If *you* live in more than one location, and *you* file a United States income tax return, the physical address (not a P.O. Box) shown on *your* United States income tax return as *your* residence will be deemed to be *your* place of *residence*. If *you* do not

file a United States income tax return, the residence where *you* spend the greatest amount of time will be deemed to be *your* place of *residence*.

*"Routine-in-hospital newborn infant care expenses"* means expenses actually incurred by or on behalf of a *covered person* born while the *policy* is in force for those services and supplies which are:

A. Administered or ordered by a *doctor;*

B. Routinely provided for the care of the newborn infant; and

C. Provided while an *inpatient* of a *hospital* within the first five days following the *covered person's* birth or before the mother ceases to be an *inpatient,* whichever occurs first.

*"Spouse"* means *your* lawful wife or husband.

*"Store-and-forward technology"* means the asynchronous transmission of a patient's medical information from a *medical practitioner* at an *originating site* to a *medical practitioner* at a *distant site.*

*"Substance-related and addictive disorders* means alcoholism and *substance-related and addictive disorders* that are listed in the current edition of the <u>International Classification of Diseases section on Mental and Behavioral Disorders</u> or the <u>Diagnostic and Statistical Manual of Mental Disorders</u> of the American Psychiatric Association. The fact that a disorder is listed in either of these reference manuals does not mean that treatment of the disorder is a *covered expense.*

*"Surgery"* or *"surgical procedure"* means an invasive diagnostic procedure or the treatment of a *covered person's illness* or *injury* by manual or instrumental operations, performed by a *doctor* while the *covered person* is under general or local anesthesia or conscious sedation.

*"Telemedicine"* means the use of electronic information and communication technology to deliver healthcare services, including without limitation the assessment, diagnosis, consultation, treatment, education, care management or self-management of a patient.

*Telemedicine* includes *store-and-forward technology* and *remote patient monitoring.*

*Telemedicine* does not include:

A. Audio-only communication, including without limitation interactive audio;

B. A facsimile machine;

C. Texting;

D. Electronic mail systems;

E. *Virtual care services* provided by a *designated virtual network provider,* as described in the Virtual Care Rider if selected and attached to this *policy/*certificate.

*"Treatment for autism spectrum disorder"* means care, treatments, interventions, services or items which are reasonably expected to: (A) prevent the onset of an *autism spectrum disorder;* (B) reduce or ameliorate the physical, mental, or developmental effects of an *autism spectrum disorder;* or (C) assist to achieve or maintain maximum functional activity in performing daily activities after being diagnosed with an *autism spectrum disorder.*

*Treatment for autism spectrum disorder* shall include the following care when prescribed, provided or ordered by a *doctor:*

A. *Evidence-based treatments;*

B. Psychiatric care, meaning direct, consultative, or diagnostic services provided by a licensed psychiatrist;

C. Psychological care, meaning direct or consultative services provided by a licensed psychologist;

D. Pharmacy care, meaning prescription medications and any health-related services necessary to determine the need of effectiveness of the medications;

E. Habilitative or rehabilitative care, meaning professional, counseling, and guidance services and treatment programs, including *applied behavioral analysis,* that are intended to develop, maintain, and restore the functioning of an individual; and

F. Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment in the areas of: (1) self-care and feeding; (2) pragmatic, receptive, and expressive language; (3) cognitive functioning; (4) *applied behavioral analysis,* intervention, and modification; (5) motor planning; and (6) sensory processing.

Therapeutic care, including behavioral speech, occupational, and physical therapies that provide treatment for *autism spectrum disorder* in the area of *applied behavioral analysis,* intervention, and

modification is limited to those services provided or supervised by a board-certified behavior analyst.

*"Unproven service(s)"* means services, including medications, that are determined not to be effective for treatment of the medical condition, and/or not to have a useful effect on health outcomes, due to insufficient and inadequate clinical evidence from *well-conducted randomized controlled trials* or *well-conducted cohort studies* in the prevailing published peer-reviewed medical literature.

    A. *"Well-conducted randomized controlled trials"* means that two or more treatments are compared to each other, the patient is not allowed to choose which treatment is received, and neither the provider nor the patient is informed as to which treatment the patient is receiving.

    B. *"Well-conducted cohort studies"* means patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.

*"Urgent care center"* means a facility, not including a *hospital emergency* room or a *doctor's* office that provides treatment or services that are required:

    A. To prevent serious deterioration of a *covered person's* health; and

    B. As a result of an unforeseen *illness* or *injury,* or the onset of acute or severe symptoms.

## SECTION 3
## POLICYHOLDER PROVISIONS

**POLICYHOLDER AUTHORITY:** The *policyholder* will act on behalf of all members in all matters pertaining to the *policy,* and every.

    A. Act done by the *policyholder;* or

    B. Agreement between *us* and the *policyholder,*

will be binding on the member.

**NOTICE:** Written notice to the *policyholder* or *you* will be effective on the date it is placed in the United States Mail. Notice will be deemed to be properly addressed if it reflects the last address shown in *our* records.

## SECTION 4
## ELIGIBILITY

**CLASSIFICATION OF ELIGIBLE PERSONS:** All persons in the following class are eligible for insurance under the *policy:*

| CLASS | CLASS DEFINITION |
|---|---|
| I | All contributing members of the *policyholder* association |

**DATE OF ELIGIBILITY:** The *primary insured* is eligible for insurance on the date the *primary insured* becomes a member of one of the classes defined above.

**DEPENDENT ELIGIBILITY:** *Dependents* of the *primary insured* are eligible on the *primary insured's effective date* if born more than 30 days prior to the *primary insured's effective date* of coverage. *Dependents* may be added to the coverage after the *primary insured's effective date* as stated in the Adding A Newborn Child/Adding an Adopted Child provisions in Section 5. Once determined to be eligible for coverage under this *policy/*certificate, the continued eligibility of the *primary insured's dependents* is tied to the eligibility of the *primary insured*.

No other person may be added as a *covered person* under this certificate.

## SECTION 5
## EFFECTIVE DATE OF INSURANCE

**EFFECTIVE DATE OF INSURANCE:** The effective date of insurance for initial *covered persons* is shown on the Data Page of the certificate.

**ADDING A NEWBORN CHILD:** An *eligible child* born to *you* or *your spouse* while this plan is in force will be a *covered person* from the time of birth. The newborn child will be covered from the time of birth for *loss* due to *Injury* and *Illness*, including *loss* from complications of birth, premature birth, and medically diagnosed defects present at birth.

No change in premium is needed for the newborn child to continue as a *covered person.*

**ADDING AN ADOPTED CHILD:** An *eligible child* legally placed for adoption with *you* or *your spouse* while this *policy/*certificate is in force will be a *covered person* from the date a petition for adoption was filed. A newborn adopted child for which petition to adopt was filed within 60 days of birth will be covered from the date of birth. The adopted child

will be covered for *loss* due to *injury* and *illness*, including *loss* from complications of birth, premature birth, and medically diagnosed defects present at birth.

No change in premium is needed for the adopted child to continue as a *covered person*.

## TERMINATION OF INSURANCE

**TERMINATION OF CERTIFICATE:** Insurance for all *covered persons* will automatically terminate on the earliest of:

A. The date the *policy* is terminated;

B. The termination date shown on the Data Page, subject to cancellation for fraud;

C. Nonpayment of premiums when due, subject to the Grace Period provision;

D. The end of the premium period on or after the date the *primary insured* turns 65, if the *primary insured* is the only *covered person*; or

E. The date of the *primary insured's* death, if the *primary insured* is the only *covered person*.

*We* will refund any premium paid and not earned due to automatic termination of the certificate.

*You* may also terminate this certificate by giving written notice to *us*. Termination by *you* will be effective on the last day for which premium has been paid.

**TERMINATION OF COVERED PERSON**: A *covered person's* coverage under this certificate will terminate at the end of the premium period on or after the date of his or her 65th birthday.

**CONTINUATION OF COVERAGE DUE TO DIVORCE OR TERMINATION OF MEMBERSHIP IN THE POLICYHOLDER ASSOCIATION GROUP:** If a person ceases to be a *covered person* due to divorce or termination of membership in the policyholder association group, the person will be eligible for continuation of coverage for the remainder of the original *policy term* selected. *We* will offer to continue the person's coverage by issuing an individual certificate if the person resides in a state where *we* offer this type of coverage. If the person resides in a state where *we* do not offer this type of coverage, then a continuation certificate cannot be issued. The premium rate applicable to the new certificate will be determined based on the current residence of the *covered person*. All other

terms and conditions of the new certificate will be the same as the original coverage. *Preexisting conditions* will be determined from the original effective date of coverage. The termination date of coverage will remain the same as the termination date of the original certificate. *Deductible amounts*, waiting periods and maximum benefit limits will be satisfied under the new certificate to the extent satisfied under this certificate at the time that the continuation of coverage is issued.

**Notification Requirements:** It is the responsibility of *you* or *your* former *spouse* to notify *us* within 31 days of the termination of your membership or *your* legal divorce. *You* must provide the address to which their continuation of coverage should be issued.

**Continuation of Coverage:** *We* will issue the continuation of coverage within 30 days after the date *we* receive timely notice of *your* ineligibility for coverage.

*Your* former *spouse* must pay the required premium within 31 days following notice from *us* or the new certificate will be void from its beginning.

**CONTINUATION UPON THE PRIMARY INSURED'S DEATH:** If more than one person is covered under this certificate, it may be continued after a *primary insured's* death by the *primary insured's spouse* if a *covered person*. The coverage will continue for the remainder of the original *policy term*.

The certificate will be changed to a plan appropriate to the *covered person(s)* that continue to be covered under it. A proper adjustment will be made in the premium required for the certificate to be continued. *We* will also refund any premium paid and not earned due to the *primary insured's* death. The refund will be based on the number of full months that remain to the next premium due date.

**EXTENSION OF BENEFITS UPON TERMINATION OF THE MASTER POLICY:** If a *covered person* is an *inpatient* in a *hospital* on the date that the master *policy* is terminated and the master *policy* is replaced without any gap in coverage by a group health insurance policy with another insurer or by a self-funded health care plan, benefits for *covered expenses* for the continuous *hospital* confinement will be extended. These extended benefits will be paid solely for *covered expenses* incurred during the *inpatient hospital* confinement. Any extended benefit will cease on the earliest of:

A. The date the *covered person's hospital* confinement ends, or

B. The date the benefits for the *hospital* confinement would have ceased under any other provision of the *policy*/certificate.

## PREMIUMS

**PREMIUM PAYMENTS:** The *primary insured* is solely responsible for the premium payments for this *policy*/certificate. Monthly premium, if the *primary insured* elected to pay on a monthly basis, is due the last day of the period for which the preceding premium was paid. Monthly premiums must be paid through a pre-authorized charge to a bank account or credit card.

**GRACE PERIOD:** *You* have until the 31st day following each premium due date to pay all premiums due. *We* may pay benefits for *your covered expenses* incurred during this 31-day grace period. Any such benefit payment is made in reliance on the receipt of the full premium due from *you* by the end of the grace period.

However, if *we* pay benefits for any claims during the grace period, and the full premium is not paid by the end of the grace period, *we* will require repayment of all benefits paid from *you* or any other person or organization that received payment on those claims. If repayment is due from another person or organization, *you* agree to assist and cooperate with *us* in obtaining repayment. *You* are responsible for repaying *us* if *we* are unsuccessful in recovering *our* benefits from these other sources.

**REINSTATEMENT:** If coverage under the *policy* lapses due to nonpayment of premium, *we* may require an application to reinstate coverage. If an application is not required, coverage will be reinstated when premium is accepted.

If *we* require an application, coverage will be reinstated upon our approval. If *we* do not approve the application for reinstatement, but fail to notify the *primary insured* in writing of the disapproval, coverage will be reinstated on the 45th day after the date of *our* receipt of the application.

The reinstated coverage will cover *loss* from *illness* and *injury*. However, the reinstated coverage will not cover *loss* from:

A. *Injury* sustained between the date the coverage lapsed and the date it was reinstated; or

B. *Illness* first manifested between the date coverage lapsed and the date it was reinstated.

The reinstated coverage will still have the same termination date shown in the Data Page.

**BILLING/ADMINISTRATIVE FEES:** Upon prior written notice, *we* may impose an administrative fee for credit card payments. This does not obligate *us* to accept credit card payments. *We* may charge a $2 fee for any check or automatic payment deduction that is returned unpaid.

## SECTION 6
## GENERAL BENEFIT PROVISIONS

**AMOUNT PAYABLE:** The total amount payable for each *covered person* per *policy term* will not exceed the maximum benefit limit as shown in the Data Page.

*We* will pay *our* portion of the applicable coinsurance in excess of the applicable *deductible amount(s)* and *copayment amount(s)* for a service or supply that:

A. Qualifies as a *covered expense* under one or more benefit provision(s); and

B. Is received while the *covered person's* insurance is in force under the *policy* if the charge for the service or supply qualifies as an *eligible expense.*

The amount payable will be subject to:

A. Any specific benefit limits stated in the *policy*;

B. A determination of *eligible expenses;* and

C. Any reduction for expenses incurred at a non-*network provider.*

The applicable *deductible amount(s), coinsurance percentage* and *copayment amount(s)* are shown in the Data Page.

**Note:** The bill *you* receive for services or supplies from a non-*network provider* may be significantly higher than the *eligible expense.* In addition to the *deductible amount,* copayment and *coinsurance percentage*, *you* are responsible for the difference between the *eligible expense* and the amount the provider bills *you* for the services. Any amount *you* pay to the provider in excess of the *eligible expense* will not apply to *your* non-*network deductible amount.* Any amount *you* pay to a non-*network provider* will not be credited to *your network deductible amount* or *network* coinsurance out-of-pocket maximum.

**TRANSPLANT BENEFITS:** For expenses incurred for or related to organ or tissue transplants, the *eligible expense* is stated under the Transplant Expense Benefits provision in the *policy/*certificate.

# MEDICAL BENEFITS

**COVERED EXPENSES:** For the purposes of these benefits, the term "*covered expenses*" means expenses actually incurred by a *covered person* for those services and supplies listed below which are:

A. Administered or ordered by a *doctor;*

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness*; and

C. Not excluded anywhere in the *policy*.

**COVERED EXPENSES:** *Covered expenses* are limited to charges:

A. Made by a *hospital* for:

1. Daily room and board and nursing services, not to exceed the *hospital's* most common semi-private room rate;

2. Daily room and board and nursing services while confined in an *intensive care unit,* not to exceed the applicable maximum limits shown on the Data Page;

3. *Inpatient* use of an operating, treatment or recovery room;

4. Outpatient use of an operating, treatment or recovery room for *surgery*;

5. Services and supplies, including drugs and medicines, which are routinely provided by the *hospital* to persons for use only while they are *inpatients;*

6. *Emergency* treatment of an *injury* or *illness*, even if confinement is not required. However, charges for the use of the *emergency* room itself for treatment of an *injury* or *illness* will be subject to the additional *emergency* room deductible shown in the Data Page if the *covered person* is not directly admitted to the *hospital* for *inpatient* treatment of that *injury* or *illness*.

B. For *surgery* in a *doctor's* office or at an *outpatient surgical facility*, including services and supplies;

C. Made by a *doctor* for professional services, including *surgery*;

D. Made by a *medical practitioner* for professional services;

E. For dressings, crutches, orthopedic splints and braces, casts, or other *necessary medical supplies;*

F. For diagnostic testing using radiologic, ultrasonographic, or laboratory services (psychometric, behavioral and educational testing are not included);

G. For chemotherapy whether administered orally, intravenously or by injection. Oral anti-cancer medication or chemotherapy will be covered the same as intravenously administered or injected cancer medication prescribed for the same purpose, and shall be subject to the same *deductible amount*, coinsurance or *copayment amount*, regardless of the setting in which the medication is administered;

H. For radiation therapy or treatment;

I. For the cost and administration of an anesthetic;

J. For oxygen and its administration;

K. For the rental of a standard hospital bed, a standard walker, a standard or non-motorized wheelchair, a wheelchair cushion and a ventilator;

L. For equipment, supplies, and services for the treatment of *diabetes,* limited to:

1. Blood glucose monitors;

2. Blood glucose monitors for the legally blind;

3. Test strips for glucose monitors, including glucose control solutions, lancets, and lancing devices;

4. Visual reading and urine test strips;

5. Insulin;

6. Injection aids, syringes, and needles;

7. Insulin pumps and related supplies;

8. FDA-approved oral agents to control blood sugar;

9. Podiatric appliances; and

10. Glucagon emergency kits and injectable glucagon.

M. For *diabetes self-management training* when *medically necessary* as determined by a physician, prescribed by a physician, and provided by an appropriately licensed health care professional who provides *us*

with a certification that the *covered person* has successfully completed the training. *Covered expenses* under this paragraph are limited to:

1. One *diabetes self-management training* program per *covered person*, per lifetime; and

2. Additional *diabetes self-management training* prescribed by a physician as *medically necessary* due to a significant change in the *covered person's* symptoms or condition.

N. For *dental expenses* when a *covered person* suffers an *injury,* after the *covered person's effective date* of coverage, which results in:

1. Damage to his or her natural teeth; and

2. Expenses which are incurred within six months of the accident or as part of a treatment plan which was prescribed by a *doctor* and began within six months of the accident.

*Injury* to the natural teeth will not include any injury as a result of chewing;

O. For hemodialysis and the charges by a *hospital* for processing and administration of blood or blood components;

P. For the following, when provided to a *covered person* who is receiving benefits for *covered expenses* in connection with a mastectomy and who elects breast reconstruction:

1. All stages of reconstruction of the breast on which the mastectomy has been performed;

2. *Surgery* and reconstruction of the other breast to produce a symmetrical appearance; and

3. Prosthesis and treatment for physical complications of mastectomy, including lymphedemas.

Q. For colorectal cancer examinations and laboratory tests for colorectal cancer in accordance with the published American Cancer Society guidelines.

R. For *reconstructive craniofacial surgery* and related services for a *covered person* of any age who is diagnosed as having a craniofacial anomaly if the *surgery* is *medically necessary* to improve functional impairment that results from the craniofacial anomaly, as determined by a nationally approved cleft-craniofacial team, approved by the American Cleft Palate-Craniofacial Association in Chapel Hill, North Carolina.

When part of a written treatment plan, *covered expenses* for treatment of a craniofacial anomaly include *reconstructive craniofacial surgery*, dental care, vision care, and the use of at least (1) hearing aid.

*"Reconstructive craniofacial surgery"* as used in this benefit provision means the use of *surgery* to alter the form and function of the cranial facial tissues due to a congenital or acquired musculoskeletal disorder.

S. Made by an assistant surgeon, limited to 16 percent of the *eligible expense* for the *surgical procedure.*

T. For diagnosis or treatment of a spine and back disorder, subject to the limit(s) stated in the Data Page.

U. For artificial eyes or larynx, breast prosthesis, orthotic devices and orthotic services, prosthetic devices and prosthetic services. Orthotic devices/services and prosthetic devices/services are limited to one device/service or replacement every three years unless proven to be *medically necessary*. If more than one prosthetic device can meet a *covered person's* functional needs, only the charge for the most cost effective prosthetic device will be considered a *covered expense.*

V. For diagnosis or treatment of alcoholism, limited to $550 per *policy term.*

W. For diagnosis of and treatment for *autism spectrum disorders,* including *evidence-based treatments*.

X. For *outpatient applied behavior analysis* for the *treatment of autism spectrum disorders* up to a maximum of $50,000 per *policy term*, per *covered person*.

Y. For *medically necessary care* and treatment of *loss* or impairment of speech or hearing, including communicative disorders.

Z. For *routine-in-hospital newborn infant care expenses.*

AA. For newborn screening tests for hypothyroidism, phenylketonuria, galactosemia, sickle-cell anemia, and other genetic disorders as mandated by state law.

BB. For *children's preventive health care services* for any *covered person* eligible by

reason of age. Immunization services that qualify as *children's preventive health care services* are exempt from any *deductible amounts,* coinsurance provisions, or *copayment amounts.*

CC. For *child health supervision services* from the moment of birth until age 9.

*"Child health supervision services"* means *periodic review* of a child's physical and emotional status performed by a physician, by a health care professional under the supervision of a physician, or in the case of hearing screening, by an individual acting in accordance with section 3701.505 of the Revised Code.

*"Periodic review"* means a review performed in accordance with the recommendations of the American academy of pediatrics and includes a history, complete physical examination, developmental assessment, anticipatory guidance, appropriate immunizations, and laboratory tests.

DD. Dialysis treatments of an acute or chronic kidney ailment, provided on an *inpatient* or outpatient basis.

EE. For one routine mammography exam during the *policy term* for each female *covered person.*

FF. For provider charges, facility fees, and professional interpretation fees for routine mammography services, subject to the stated limitations:

1. For a female *covered person* who is not a *woman at risk* and who is at least age 35 but less than age 40, one (1) breast cancer screening mammography.

2. For a female *covered person* who is not a *woman at risk*, and who is at least age 40 but less than age 50, one (1) breast cancer screening mammography in every two (2) year period.

3. For a female *covered person* who is either a *woman at risk*, or at least age 50 but less than age 65, one (1) breast cancer screening mammography every year.

*Covered expenses* are limited to 130 percent of the lowest Medicare reimbursement rate for the state of Ohio. Charges the provider may bill *you* for these services are limited to the *deductible amount* and coinsurance.

GG. For one cervical smear or pap smear during the *policy term* for each female *covered person.*

HH. For one digital rectal exam and one prostate specific antigen test per *policy term* per *covered person* for screening for the early detection of prostate cancer. Benefits shall be exempt from the *deductible amount.* Coverage for screenings does not diminish or limit diagnostic benefits otherwise available under the *policy/*certificate.

II. For a *medically necessary gastric pacemaker.*

JJ. For treatment of *medical disorders requiring specialized nutrients and formulas,* including treatment with *medical foods,* regardless of whether the delivery method is enteral or oral.

KK. For *telemedicine* services to the same extent that those services provided would otherwise be *covered expenses* under the *policy/*certificate.

*Covered expenses* shall include a facility fee to the *originating site.* The combined reimbursement to the *originating site* and *distant site* shall be limited to the *covered expense* for the service when provided in person.

**AMBULANCE SERVICE BENEFITS:** *Covered expenses* will include ambulance services for local transportation:

A. To the nearest *hospital* that can provide services appropriate to the *covered person's illness* or *injury;* or

B. To the nearest neonatal special care unit for newborn infants for treatment of *illnesses, injuries,* birth defects, or complications of premature birth that require that level of care.

Benefits for air ambulance services are limited to:

A. Services requested by police or medical authorities at the site of an *emergency;* or

B. Those situations in which the *covered person* is in a location that cannot be reached by ground ambulance.

*Covered expenses* for air ambulance services are limited to the maximum amount shown in the Data Page.

**Exclusions:** No benefits will be paid for:

A. Expenses incurred for ambulance services covered by a local governmental or municipal body, unless required by law;

B. Non-*emergency* air ambulance;

C. Air ambulance outside of the 50 United States; and

D. Ambulance services provided for a *covered person's* comfort or convenience.

## HOME HEALTH CARE EXPENSE BENEFITS

**HOME HEALTH CARE EXPENSES:** Under this clause, *covered expenses* for *home health care* are limited to the following charges:

A. *Home health aide services*;

B. Services of a private duty registered nurse rendered on an *outpatient* basis;

C. Professional fees of a licensed respiratory, physical, occupational or speech therapist required for *home health care*;

D. I.V. medication and pain medication, to the same extent as it would have been covered during an *inpatient hospital* stay;

E. Hemodialysis, and for the processing and administration of blood or blood components;

F. *Necessary medical supplies*; and

G. Rental of the *durable medical equipment* set forth below to the same extent as it would have been covered during an *inpatient hospital* stay:

   1. I.V. Stand and I.V. Tubing;

   2. Infusion Pump or Cassette;

   3. Portable Commode;

   4. Patient Lift;

   5. Bili-lights; and

   6. Suction Machine and Suction Catheters.

(At *our* option, *we* may approve the purchase of the equipment in lieu of its rental if the rental price is projected to be more than the equipment purchase price, but only from a provider *we* approve before the purchase. If the equipment is purchased, the *covered person* must return the equipment to *us* when it is no longer in use.)

**DEFINITIONS:**

*"Home health aide services"* means those services provided by a home health aide employed by a *home health care agency* and supervised by a registered nurse, which are for the personal care of a *covered person*.

*"Home health care"* means care or treatment of an *illness* or *injury* at the *covered person's* home that is: (A) provided by a *home health care agency;* and prescribed and supervised by a *doctor*.

*"Home health care agency"* means a public or private agency or one of its subdivisions, which:

A. Operates pursuant to law as a *home health care agency;*

B. Is regularly engaged in providing *home health care* under the regular supervision of a registered nurse;

C. Maintains a daily medical record on each patient; and

D. Provides each patient with a planned program of observation and treatment by a *doctor*, in accordance with existing standards of medical practice for the *injury* or *illness* requiring the *home health care*.

An agency which is approved to provide *home health care* to those receiving Medicare benefits will be deemed to be a *home health care agency*.

**LIMITATIONS:** Covered expenses for *home health aide services* will be limited to 7 visits per week. Each eight-hour period of *home health aide services* will be counted as one visit.

*Covered expenses* for intermittent private duty registered nurse visits (not more than 4 hours each) will be limited to $75 per visit.

**EXCLUSION:** No benefits will be payable for charges related to respite care, *custodial care* or educational care.

## REHABILITATION AND EXTENDED CARE FACILITY EXPENSE BENEFITS

*Covered expenses* include expenses incurred for *rehabilitation services* or confinement in an *extended care facility*, subject to the following limitations:

A. *Covered expenses* available to a *covered person* while confined primarily to receive

*rehabilitation* are limited to those specified in this provision.

B. *Rehabilitation* services or confinement in a *rehabilitation facility* or *extended care facility* must begin within 14 days of a *hospital* stay of at least 3 consecutive days and be for treatment of, or *rehabilitation* related to, the same *illness* or *injury* that resulted in the *hospital* stay.

C. *Covered expenses* for *rehabilitation* and *extended care facility* expenses are limited to a combined maximum of 60 days per *policy term* for each *covered person.*

D. *Covered expenses* for *provider facility services* are limited to charges made by a *hospital, rehabilitation facility,* or *extended care facility* for:

1. Daily room and board and nursing services;

2. Drugs and medicines that:

   a. Are prescribed by a *doctor;*

   b. Must be filled by a licensed pharmacist; and

   c. Are approved by the U.S. Food and Drug Administration; and

3. Diagnostic testing.

E. *Covered expenses* for non-*provider facility* services are limited to charges incurred for the professional services of *rehabilitation medical practitioners.*

**Maximum Benefits:** Subject to the limitations stated in this Rehabilitation and Extended Care Facility Expense Benefits provision, benefits for *covered expenses* under this provision are limited to 60 days per *policy term* for each *covered person.*

Care ceases to be *rehabilitation* upon *our* determination of any of the following:

A. The *covered person* has reached maximum therapeutic benefit;

B. Further treatment cannot restore bodily function beyond the level the *covered person* already possesses;

C. There is no measurable progress toward documented goals; or

D. Care is primarily *custodial care.*

**DEFINITIONS:**

"*Acute rehabilitation*" means two or more different types of therapy provided by one or more

*rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

"*Extended care facility*" means an institution, or a distinct part of an institution, which:

A. Is licensed as a *hospital, extended care facility* or *rehabilitation facility* by the state in which it operates;

B. Is regularly engaged in providing 24-hour skilled nursing care under the regular supervision of a *doctor* and the direct supervision of a registered nurse;

C. Maintains a daily record on each patient;

D. Has an effective utilization review plan;

E. Provides each patient with a planned program of observation prescribed by a *doctor;* and

F. Provides each patient with active treatment of an *illness* or *injury,* or related *rehabilitation,* in accordance with existing standards of medical practice for that condition.

*Extended care facility* does not include a facility primarily for rest, the aged, the treatment of *substance-related and addictive disorders, custodial care,* nursing care, or for care of *mental disorders* or the mentally incompetent.

"*Intensive day rehabilitation*" means two or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for three or more hours per day, five to seven days per week.

"*Maximum therapeutic benefit*" means the point in the course of treatment where no further improvement in a *covered person's* medical condition can be expected, even though there may be fluctuations in levels of pain and function.

"*Medically stabilized*" means that the person is no longer experiencing further deterioration as a result of prior *injury* or *illness* and there are no acute changes in physical findings, laboratory results or radiologic results which necessitate acute medical care. Acute medical care does not include *acute rehabilitation.*

"*Pain management program*" means a program using interdisciplinary teams providing coordinated, goal-oriented services to a *covered person* who has chronic pain that significantly interferes with

physical, psychosocial, and vocational functioning, for the purpose of reducing pain, improving function, and decreasing dependence on the health care system. A *pain management program* must be individualized and provide physical rehabilitation, education on pain, relaxation training, and medical evaluation.

"*Rehabilitation*" means care for restoration (including by education or training) of one's prior ability to function at a level of *maximum therapeutic benefit*. This type of care must be *acute rehabilitation, subacute rehabilitation,* or *intensive day rehabilitation,* and it includes *rehabilitation therapy,* and *pain management programs.* An *inpatient* hospitalization will be deemed to be for *rehabilitation* at the time the patient has been *medically stabilized* and begins to receive *rehabilitation therapy* or treatment under a *pain management program.*

"*Rehabilitation facility*" means an institution or a separate identifiable *hospital* unit, section, or ward that: (A) is licensed by the state as a *rehabilitation facility;* and (B) operates primarily to provide 24-hour primary care or *rehabilitation* of sick or injured persons as *inpatients.*

*Rehabilitation facility* does not include a facility primarily for rest, the aged, long term care, assisted living, *custodial care,* nursing care or for care of the mentally incompetent.

"*Rehabilitation medical practitioner*" means a *doctor,* physical therapist, speech therapist, occupational therapist, or respiratory therapist. A *rehabilitation medical practitioner* must be licensed or certified by the state in which care is rendered and performing services within the scope of that license or certification.

"*Rehabilitation therapy*" means physical therapy, occupational therapy, speech therapy, or respiratory therapy.

"*Subacute rehabilitation*" means one or more different types of therapy provided by one or more *rehabilitation medical practitioners* and performed for one-half hour to two hours per day, five to seven days per week, while the *covered person* is confined as an *inpatient* in a *hospital, rehabilitation facility,* or *extended care facility.*

**Exclusion:** No benefits will be paid under this Rehabilitation and Extended Care Facility benefit provision for charges for services or confinement related to treatment or therapy for *mental disorders* or *substance-related and addictive disorders.*

## TRANSPLANT EXPENSE BENEFITS

**TRANSPLANT EXPENSES COVERED UNDER MEDICAL BENEFITS:** The following types of tissue transplants are *covered expenses* under the Medical Benefits provision:

 A. Cornea transplants;

 B. Artery or vein grafts;

 C. Heart valve grafts;

 D. Prosthetic tissue replacement, including joint replacements; and

 E. Implantable prosthetic lenses, in connection with cataracts.

## ALL OTHER COVERED EXPENSES FOR TRANSPLANT EXPENSES:

If *we* determine that a *covered person* is an appropriate candidate for a *listed transplant,* Medical Benefits *covered expenses* will be provided for:

 A. Pre-transplant evaluation;

 B. Pre-transplant harvesting;

 C. Pre-transplant stabilization, meaning an *inpatient* stay to medically stabilize a *covered person* to prepare for a later transplant, whether or not the transplant occurs;

 D. High dose chemotherapy;

 E. Peripheral stem cell collection;

 F. The transplant itself, not including the acquisition cost for the organ or bone marrow (except at a *Center of Excellence*); and

 G. Post transplant follow-up.

**DEFINITIONS:** As used in this provision, the following terms have the meanings indicated:

"*Allogeneic bone marrow transplant*" or "*BMT*" means a procedure in which bone marrow from a related or non-related donor is infused into the transplant recipient and includes peripheral blood stem cell transplants.

"*Autologous bone marrow transplant*" or "*ABMT*" means a procedure in which the bone marrow infused is derived from the same person who is the transplant recipient and includes peripheral blood stem cell transplants.

*"Center of Excellence"* means a *hospital* that: (A) specializes in a specific type or types of *listed transplants;* and (B) has agreed with *us*, to provide quality care on a cost efficient basis.

*"Listed transplant"* means one of the following procedures and no others:

A. Heart transplants;

B. Lung transplants;

C. Heart/lung transplants;

D. Kidney transplants;

E. Liver transplants; and

F. Bone marrow transplants for the following conditions:

    1. *BMT* or *ABMT* for Hodgkin's lymphoma;

    2. *BMT* or *ABMT* for non-Hodgkin's lymphoma;

    3. *BMT* for severe Aplastic Anemia;

    4. *BMT* or *ABMT* for Acute Lymphocytic and Nonlymphocytic Leukemia;

    5. *BMT* for Chronic Myelogenous Leukemia;

    6. *ABMT* for Testicular Cancer;

    7. *BMT* for Severe Combined Immunodeficiency;

    8. *BMT* or *ABMT* for Stage III or IV Neuroblastoma;

    9. *BMT* for Myelodysplastic Syndrome;

    10. *BMT* for Wiskott-Aldrich Syndrome;

    11. *BMT* for Thalassemia Major;

    12. *BMT* or ABMT for Multiple Myeloma;

    13. *ABMT* for pediatric Ewing's sarcoma and related primitive neuroectodermal tumors, Wilm's tumor, rhabdomyosarcoma, medulloblastoma, astrocytoma and glioma;

    14. *BMT* for Fanconi's anemia;

    15. *BMT* for malignant histiocytic disorders; and

    16. *BMT* for juvenile myelo-monocytic leukemia.

**TRANSPLANT DONOR EXPENSES:** *We* will cover the medical expenses incurred by a live donor as if they were medical expenses of the *covered person* if:

A. The *covered person* received an organ or bone marrow of the live donor;

B. The transplant was a *listed transplant;* and

C. They would otherwise be considered *covered expenses* under the *policy*.

**ANCILLARY "CENTER OF EXCELLENCE" EXPENSES:** A *covered person* may obtain services in connection with a *listed transplant* from any willing provider of such services. But, if a *listed transplant* is performed in a *Center of Excellence*:

A. *Covered expenses* for the *listed transplant* will include the acquisition cost of the organ or bone marrow; and

B. *We* will pay a maximum of $5,000 per transplant for the following services:

    1. Transportation for the *covered person,* any live donor and the *immediate family* to go with the *covered person* to and from the *Center of Excellence;* and

    2. Lodging at or near the *Center of Excellence* for any live donor, and the *immediate family* accompanying the *covered person* while the covered person is confined in the *Center of Excellence.*

*We* must make the arrangements and pay the costs directly for the transportation and lodging.

**EXCLUSIONS:** No benefits will be paid under these Transplant Expense Benefits for charges:

A. For search and testing in order to find a suitable donor;

B. For a prophylactic bone marrow harvest or peripheral blood stem cell collection when no *listed transplant* occurs;

C. For animal to human transplants;

D. For artificial or mechanical devices designed to replace a human organ temporarily or permanently;

E. For obtaining or transporting the organ or tissue unless expressly provided for in this provision;

F. To keep a donor alive for the transplant operation;

G. For a live donor where the live donor is receiving a transplanted organ to replace the donated organ;

H. Related to transplant not included under this provision as a *listed transplant*; or

I. For a *listed transplant* under study in an ongoing phase I or II clinical trial as set forth in the United States Food and Drug Administration (*"USFDA"*) regulation, whether or not the trial is subject to *USFDA* oversight.

**LIMITATIONS ON TRANSPLANT EXPENSE BENEFITS:** In addition to the exclusions and limitations specified elsewhere in this section:

A. *Covered expenses* for *listed transplants* will be limited to two transplants for each *covered person*.

B. If a designated *Center of Excellence* is not used, *covered expenses* for a listed transplant will be limited to one transplant and a maximum benefit limit of $100,000 for all expenses associated with the transplant.

C. If a designated *Center of Excellence* is not used, the acquisition cost for the organ or bone marrow is not covered.

# SECTION 7
# GENERAL EXCLUSIONS AND LIMITATIONS

No benefits will be paid for:

A. Any service or supply which would be provided without cost to *you* or *your* covered *dependent* in the absence of insurance covering the charge.

B. Expenses/surcharges imposed on *you* or *your* covered *dependent* by a provider (including a *hospital*) but which are actually the responsibility of the provider to pay.

C. Any services performed by a member of the *covered person's immediate family*.

D. Any services not identified and included as *covered expenses* under the *policy*/certificate. *You* will be fully responsible for payment for any services that are not *covered expenses*.

E. Any part of the charges that are in excess of *eligible expenses*.

Even if not specifically excluded by the *policy*, no benefit will be paid for a service or supply unless it is:

A. Administered or ordered by a *doctor*; and

B. *Medically necessary* to the diagnosis or treatment of an *injury* or *illness*.

No benefits will be paid for any services not identified and included as *covered expenses* under the *policy*. *You* will be fully responsible for payment for any services which are not *covered expenses*.

*Covered expenses* will not include, and no benefits will be paid for any charges which are incurred:

A. For weight modification, or for surgical treatment of obesity, including wiring of the teeth and all forms of intestinal bypass *surgery*;

B. For breast reduction or augmentation;

C. For any drug, treatment or procedure that promotes conception, including but not limited to:

1. Artificial insemination; or

2. Treatment for infertility or impotency;

D. Sterilization or reversal of sterilization;

E. Abortion (unless the life of the mother would be endangered if the fetus were carried to term);

F. For treatment of malocclusions, disorders of the temporomandibular joint or craniomandibular disorders;

G. For expenses for television or telephone, or for expenses for other persons;

H. For marriage, family, or child counseling for the treatment of premarital, marriage, family or child relationship dysfunctions;

I. For stand-by availability of a *medical practitioner* when no treatment is rendered;

J. For telephone consultations or failure to keep a scheduled appointment;

K. Made by a *hospital* for room and board and nursing services for the first Friday or Saturday of an *inpatient* stay which begins on one of those days, unless:

1. It is an *emergency*; or

2. *Medically necessary inpatient surgery* is scheduled for the day after the date of admission;

L. For services or supplies which are not actually provided while the *policy*/certificate is in force;

M. For *dental expenses*, including braces for any medical or dental condition, *surgery* and treatment for oral *surgery*, except as expressly provided for under Medical Expense Benefits;

N. For *cosmetic treatment*, except for *reconstructive surgery* which is incidental to or follows *surgery* or an *injury* which was covered under the *policy*, or is performed to correct a birth defect in a child who has been a *covered person* from its birth until the date *surgery* is performed;

O. For diagnosis or treatment of learning disabilities, attitudinal disorders, or disciplinary problems;

P. For diagnosis or treatment of nicotine addiction.

Q. For charges related to, or in preparation for, tissue or organ transplants, except as expressly provided for under the Transplant Expense Benefits.

R. For high-dose chemotherapy prior to, in conjunction with, or supported by *ABMT/BMT*, except as specifically provided under the Transplant Expense Benefits provision;

S. For eye refractive *surgery*, when the primary purpose is to correct nearsightedness, farsightedness, or astigmatism;

T. While confined primarily to receive *rehabilitation, custodial care,* educational care or nursing services (unless expressly provided for by the *policy*);

U. For eyeglasses, contact lenses, hearing aids, eye refraction, visual therapy, or for any exam or fitting related to these devices, except as expressly provided for under the *policy*;

V. Due to *pregnancy* (except for *complications of pregnancy*), except as expressly provided for under the *policy;*

W. For any expenses, including expenses for diagnostic testing, incurred while confined primarily for well-baby care, except as expressly provided for under the policy;

X. For preventive care or prophylactic care, including routine physical exams, premarital exams and educational programs, except as expressly provided for by the *policy*;

Y. For expenses incurred outside of the United States, except for expenses incurred for *emergency* treatment of a *covered person*;

Z. As a result of:

   1. Intentionally self-inflicted bodily harm (whether the *covered person* is sane or insane);

   2. *Injury* or *illness* caused by an act of declared or undeclared war; or

   3. The *covered person* taking part in a riot; or

   4. The *covered person's* commission of a felony, whether or not charged;

AA. For or related to *durable medical equipment* or for its fitting, implantation, adjustment or removal or for complications therefrom, except as expressly provided for under the *policy;*

BB. For or related to surrogate parenting;

CC. For or related to treatment of hyperhidrosis (excessive sweating);

DD. For fetal reduction *surgery*;

EE. As a result of an *injury* or *illness* arising out of, or in the course of, employment for wage or profit, if the *covered person* is insured, or is required to be insured, by worker's compensation insurance pursuant to applicable state or federal law. If *you* enter into a settlement that waives a *covered person's* right to recover future medical benefits under a worker's compensation law or insurance plan, this exclusion will still apply.

FF. Except as specifically identified as a *covered expense* under the *policy*/certificate, expenses for alternative treatments including acupressure; acupuncture; aroma therapy; hypnotism; massage therapy; rolfing; and other forms of alternative treatment as defined by the Office of Alternative Medicine of the National Institutes of Health.

GG. For any *illness* incurred as a result of the *covered person* being intoxicated, as defined by applicable state law in the state in which the *loss* occurred, or under the influence of illegal narcotics or controlled substance unless administered or prescribed by a *doctor;*

HH. For joint replacement, unless related to an *injury* that is covered under the *policy;*

II. For non-*emergency* treatment of tonsils, adenoids, hemorrhoids, or hernia;

JJ. For modification of the physical body in order to improve the psychological, mental or emotional well-being of the *covered person*, such as sex-change *surgery*;

KK. As a result of any *injury* sustained during or due to participating, instructing,

demonstrating, guiding, or accompanying others in any of the following:

1. Professional or semi-professional sports;

2. Intercollegiate sports (not including intramural sports);

3. Parachute jumping;

4. Hang-gliding;

5. Racing or speed testing any motorized vehicle or conveyance;

6. Scuba/skin diving (when diving 60 or more feet in depth);

7. Skydiving;

8. Bungee jumping; or

9. Rodeo sports.

LL. As a result of any *injury* sustained during or due to participating, instructing, demonstrating, guiding, or accompanying others in any of the following if the *covered person* is paid to participate or instruct:

1. Operating or riding on a motorcycle;

2. Racing or speed testing any non-motorized vehicle or conveyance;

3. Horseback riding;

4. Rock or mountain climbing; or

5. Skiing.

MM.As a result of any *injury* sustained while operating, riding in, or descending from any type of aircraft if the *covered person* is a pilot, officer, or member of the crew of such aircraft or is giving or receiving any kind of training or instructions or has any duties that require him or her to be aboard the aircraft;

NN. For vocational or recreational therapy, vocational rehabilitation, or occupational therapy, except as expressly provided for by the *policy*

OO. For a service for which a non-*network provider* waives, does not pursue, or fails to collect any applicable *copayment amount, deductible amount,* or *coinsurance percentage* owed.

PP. For diagnosis and treatment of *mental disorders, substance-related and addictive disorders,* or for court-ordered treatment programs for *substance-related and addictive disorders,* except as expressly provided for by the *policy*;

QQ. For any portion of the charges which are in excess of the *eligible expense.*

**EXPERIMENTAL OR INVESTIGATIONAL TREATMENT OR UNPROVEN SERVICES:** *Covered expenses* will not include, and no benefits will be paid for any charges which are incurred for *experimental or investigational treatment(s)* or *unproven services.* The fact that an *experimental or investigational treatment* or *unproven service* is the only available treatment for a particular condition will not result in benefits if the procedure is considered to be an *experimental or investigational treatment* or *unproven service* for the treatment of that particular condition.

# SECTION 8
# PREEXISTING CONDITIONS

*Preexisting conditions,* and complications resulting from a *preexisting condition,* will not be covered under the *policy*/certificate.

# COORDINATION OF THIS CONTRACT'S BENEFITS WITH OTHER BENEFITS

This Coordination of Benefits (COB) provision applies when a person has health care coverage under more than one *plan. Plan* is defined below.

The order of benefit determination rules govern the order in which each *plan* will pay a claim for benefits. The *plan* that pays first is called the *primary plan.* The *primary plan* must pay benefits in accordance with its policy terms without regard to the possibility that another *plan* may cover some expenses. The *plan* that pays after the *primary plan* is the *secondary plan.* The *secondary plan* may reduce the benefits it pays so that payments from all *plans* do not exceed 100% of the total *allowable expense.*

**DEFINITIONS:**

A. A "*plan*" is any of the following that provides benefits or services for medical or dental care or treatment. If separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same plan and there is no COB among those separate contracts.

1. *Plan* includes: group and nongroup insurance contracts, health insuring corporation ("HIC") contracts, *closed panel plans,* or other forms of group or group-type coverage (whether insured

or uninsured); medical care components of long-term care contracts, such as skilled nursing care; medical benefits under group or individual automobile contracts; and Medicare or any other federal governmental plan, as permitted by law.

2. *Plan* does not include: hospital indemnity coverage or other fixed indemnity coverage; accident only coverage; specified disease or specified accident coverage; supplemental coverage as described in Revised Code sections 3923.37 and 1751.56; school accident type coverage; benefits for non-medical components of long-term care policies; Medicare supplement policies; Medicaid policies; or coverage under other federal governmental plans, unless permitted by law.

3. Each contract for coverage under 1 or 2 is a separate *plan*. If a *plan* has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate *plan*.

B. *"This plan"* means, in a COB provision, the part of the contract providing the health care benefits to which the COB provision applies and which may be reduced because of the benefits of other plans. Any other part of the contract providing health care benefits is separate from *this plan*. A contract may apply one COB provision to certain benefits, such as dental benefits, coordinating only with similar benefits, and may apply another COB provision to coordinate other benefits.

C. The order of benefit determination rules determine whether *this plan* is a *primary plan* or a *secondary plan* when the person has health care coverage under more than one *plan*.

When *this plan* is *primary*, it determines payment for its benefits first before those of any other *plan* without considering any other *plan's* benefits. When *this plan* is *secondary*, it determines its benefits after those of another *plan* and may reduce the benefits it pays so that all *plan* benefits do not exceed 100% of the total *allowable expense*.

D. *"Allowable expense"* is a health care expense, including deductibles, coinsurance, and copayments, that is covered at least in part by any *plan* covering the person. When a *plan* provides benefits in the form of service, the reasonable cash value of each service will be considered as both an *allowable expense* and a benefit paid. An expense that is not covered by any *plan* covering the person is not an *allowable expense*. In addition, any expense that a provider by law or in accordance with a contractual agreement is prohibited from charging a *covered person* is not an *allowable expense*.

The following are examples of expenses that are not *allowable expenses*:

1. The difference between the cost of a semi-private *hospital* room and a private *hospital* room is not an *allowable expense,* (unless the provides coverage for private *hospital* room) is not an *allowable expense.*

2. If a person is covered by two or more *plans* that compute their benefit payments on the basis of usual and customary fees or relative value schedule reimbursement or other similar reimbursement methodology, any amount in excess of the highest reimbursement amount for a specific benefit is not an *allowable expense.*

3. If a person is covered by two or more *plans* that provide benefits or services payments on the basis of negotiated fees, any amount in excess of the highest negotiated fee is not an *allowable expense.*

4. If a person is covered by one *plan* that calculates its benefits or services on the basis of usual and customary fees or relative value schedule reimbursement methodology or other similar reimbursement methodology and another *plan* that provides its benefits or services on the basis of negotiated fees, the *primary plan's* payment agreements shall be the *allowable expense* for all *plans*. However, if the provider has contracted with the *secondary plan* to provide the benefit or service for a specific negotiated fee or payment amount that is different that the *primary plan's* arrangement and if the provider's contract permits, that negotiated fee or payment shall be the *allowable expense* used by the *secondary plan* to determine benefits.

5. The amount that benefit reduction by the *primary plan* because a *covered person* has failed to comply with the *plan* provisions is not an *allowable expense*. Examples of these types of plan provisions include second surgical opinions, precertification of admissions, and preferred provider arrangements.

E. *"Closed panel plan"* is a *plan* that provides health care benefits to *covered persons* primarily in the form of services through a panel of providers that have contracted with or are employed by the *plan*, and that coverage for services provided by other providers, except in cases of emergency or referral by a panel member.

F. *"Custodial parent"* is the parent awarded custody by a court decree, or in the absence of a court decree, is the parent with whom the child resides more than one half of the calendar year excluding temporary visitation.

**ORDER OF BENEFIT DETERMINATION RULES**

When a person is covered by two or more *plans*, the rules for determining the order of benefit payments are as follows:

A. The *primary plan* pays or provides its benefits as if the *secondary plan* or *plans* did not exist.

B. Except as provided in paragraph B.(2).

1. A *plan* that does not contain a coordination of benefits provision that is consistent with this regulation is always *primary* unless the provisions of both *plans* state that the complying plan is *primary*.

2. Coverage that is obtained by virtue of membership in a group that is designed to supplement a part of a basic package of benefits and provides that this supplementary coverage shall be excess to any other parts of the *plan* provided by the contract holder. Examples of these types of situations are major medical coverages that are superimposed over base *plan* hospital and surgical benefits, and insurance type coverages that are written in connection with a *closed panel plan* to provide out-of- network benefits.

C. A *plan* may consider the benefits paid or provided by another plan in calculating

payment of its benefits only when it is *secondary* to that other *plan*.

D. Each *plan* determines its order of benefits using the first of the following rules that apply:

1. **Non-Dependent or Dependent -** The *plan* that covers the person other than as a dependent, for example as an employee, member, policyholder, subscriber or retiree, is the *primary plan* and the *plan* that covers the person as a dependent is the *secondary plan*. However, if the person is a Medicare beneficiary and, as a result of federal law, Medicare is *secondary* to the *plan* covering the person as a dependent; and *primary* to the *plan* covering the insured person as other than a dependent (e.g. a retired employee), then the order of benefits between the two *plans* is reversed so that the *plan* covering the person as an employee, member, policyholder, subscriber or retiree is *secondary* and the other *plan* is *primary*.

2. **Child Covered Under More Than One Plan -** Unless there is a court decree stating otherwise, when a dependent child is covered by more than one *plan* the order of benefits is determined as follows:

   a. For a dependent child whose parents are married or living together, whether or not they have ever been married:

      i. The *plan* of the parent whose birthday falls earlier in the calendar year is the *primary plan;* or

      ii. If both parents have the same birthday, the *plan* that has covered the parent the longest is the *primary plan.*

   However, if one spouse's *plan* has some other coordination rule (for example, a "gender rule" which says the father's *plan* is always *primary*), *we* will follow the rules of that plan.

   a. For a dependent child whose parents are divorced or separated or not living together, whether or not they have been married.

      i. If a court decree states that one of the parents is responsible for

the dependent child's health care expenses or health care coverage and the *plan* of that parent has actual knowledge of those terms, that *plan* is *primary*. That rule applies to the plan years commencing after the *plan* is given notice of the court decree;

ii. If a court decree states that both parents are responsible for the dependent child's health care expenses or health care coverage, the provisions of Subparagraph (a) above shall determine the order of benefits;

iii. If a court decree states that the parents have joint custody without specifying that one parent has responsibility for the health care coverage of the dependent child, the provisions of subparagraph (a) above shall determine the order of benefits; or

iv. If there is no court decree allocating responsibility for the dependent child's health care expenses or health care coverage, the order of benefits for the child are as follows:

    a. The plan covering the custodial parent;

    b. The *plan* covering the spouse of the *custodial parent*;

    c. The *plan* covering the non-*custodial parent*; and then

    d. The *plan* covering the spouse of the non-*custodial parent.*

b. For a dependent child covered under more than one *plan* of individuals who are not the parents of the child, the provision of paragraphs (a) and (b) above shall determine the order of benefits as if those individuals were parents of the child.

3. **Active Employee or Retired or Laid-Off Employee -** The *plan* that covers a person as an active employee, who is neither laid off nor retired, is the *primary plan*. The *plan* covering that same person as a retired or laid-off employee is the *secondary plan*. The same would hold true if a person is a dependent of an active employee and that same person is a dependent of a retired or laid-off employee. If the other *plan* does not have this rule, and if, as a result, the *plans* do not agree on the order of benefits, this rule is ignored. This rule does not apply if rule D. (1) can determine the order of benefits.

4. **COBRA or State Continuation Coverage -** If a person whose coverage is provided pursuant to COBRA or under a right of continuation by state or other federal law is covered under another *plan*, the *plan* covering the person as an employee, member, subscriber, or retiree or covering the person as a dependent of an employee, member, subscriber, or retiree is the *primary plan*, and the COBRA or state or other federal continuation coverage is the *secondary plan*. If the other *plan* does not have this rule, and as a result, the *plans* do not agree on the order of benefits, this rule is ignored. This rule does not apply if rule D.(1) can determine the order of benefits.

5. **Longer or Shorter Length of Coverage -** The *plan* that covered the person as an employee, member, policyholder, subscriber or retiree longer is the *primary plan*, and the *plan* that covered the person the shorter period of time is the *secondary plan.*

6. If the preceding rules do not determine the order of benefits, the *allowable expenses* shall be shared equally between the *plans* meeting the definition of *plan*. In addition, this *plan* will not pay more than it would have paid had it been the *primary plan.*

**EFFECT ON THE BENEFITS OF THIS PLAN**

When this *plan* is *secondary* it may reduce its benefits paid or provided by all *plans* during a plan year are not more than the total *allowable expenses.* In determining the amount to be paid for any claim, the *secondary plan* will calculate the benefits it would have paid in the absence of other health care coverage and apply that calculated amount to any *allowable expense* under its *plan* that is unpaid by the *primary plan*. The *secondary plan* may then reduce its payment by the amount so that, when combined with the amount paid by the

*primary plan*, the total benefits paid or provided by all *plans* for the claim do not exceed the total *allowable expense* for that claim. In addition, the *secondary plan* shall credit to its plan deductible any amounts it would have credited to its deductible in the absence of other health care coverage credited in the absence of other health care coverage.

If a *covered person* is enrolled in two or more *closed panel plans* and if, for any reason, including the provision of service by a non-panel provider, benefits are not payable by one *closed panel plan*, COB shall not apply between that *plan* and other *closed panel plans*.

## RIGHT TO RECEIVE AND RELEASE NEEDED INFORMATION

Certain facts about health care coverage and services are needed to apply these COB rules and to determine benefits payable under this *plan* and other *plans*. Claims Administration may get the facts it needs from or give them to other organizations or persons for the purpose of applying these rules and determining benefits payable under this *plan* and other *plans* covering the person claiming benefits. Claims Administration need not tell, or get the consent of, any person to do this. Each person claiming benefits under this *plan* must give Claims Administration any facts it needs to apply those rules and determine benefits payable.

## FACILITY OF PAYMENT

A payment made under another *plan* may include an amount that should have been paid under this *plan*. If it does, Claims Administration may pay that amount to the organization that made that payment. That amount will be treated as though it were a benefit paid under this *plan*. Claims Administration will not have to pay that amount again. The term "payment made" includes providing benefits in the form of services, in which case "payment made" means reasonable cash value of the benefits provided in the form of services.

## RIGHT OF RECOVERY

If the amount of payments made by Claims Administration is more than it should have paid under this COB provision, it may recover the excess from one or more of the persons it has paid or for whom it has paid; or any other person or organization that may be responsible for the benefits or services provided for the *covered person*. The "amount of the payments made" includes the reasonable cash value of any benefits provided in the form of services.

## COORDINATION DISPUTES

If *you* believe that *we* have not paid a claim properly, *you* should first attempt to resolve the problem by contacting *us* by telephone at 800-657-8205 or contacting *us* online at www.myuhone.com. If *you* are still not satisfied, *you* may call the Ohio Department of Insurance for instructions on filing a consumer complaint. Call 1-800-686-1526, or visit the Department's website at http://insurance.ohio.gov.

## CONDITIONS PRIOR TO LEGAL ACTION

On occasion, *we* may have a disagreement related to coverage, benefits, premiums, or other provisions under this *policy*. Litigation is an expensive and time-consuming way to resolve these disagreements and should be the last resort in a resolution process. Therefore, with a view to avoiding litigation, *we* request that *you* give written notice to *us* of *your* intent to sue *us* prior to bringing any legal action. *Your* notice must:

A. Identify the coverage, benefit, *premium*, or other disagreement;

B. Refer to the specific *policy* provision(s) at issue; and

C. Include all relevant facts and information that support *your* position.

Please refer to the Golden Rule Insurance Company Ohio Appeal Procedures provision in the certificate for a description of your rights to an appeal.

## REIMBURSEMENT

If a *covered person's illness* or *injury* is caused by the acts or omissions of a *third party*, *we* will not cover a *loss* to the extent that it is paid as part of a settlement or judgment by any *third party*. But, if payment by or for the *third party* has not been made by the time *we* receive acceptable *proof of loss*. *We* will have the right to be reimbursed to the extent of benefits *we* paid for the *illness* or *injury* if the *covered person* subsequently receives any payment from any *third party*. The *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) shall promptly pay *us* back from the settlement, judgment, or any payment received from any *third party*.

The *covered person* or anyone acting on his or her behalf (including, but not limited to, the guardian, legal representatives, estate, or heirs) agrees:

A. To fully cooperate with *us* in order to obtain information about the *loss* and its cause;

B. To immediately tell *us* in writing of any claim made or lawsuit filed on behalf of a *covered person* in connection with the *loss*;

C. To include the amount of benefits paid by *us* on behalf of a *covered person* in any claim made against any *third party*;

D. That *we*:

    1. Will have a lien on all money received by a *covered person* in connection with the *loss* equal to the amount *we* have paid;

    2. May give notice of that lien to any *third party* or *third party's* agent or representative;

    3. Will have the right to intervene in any suit or legal action to protect *our* rights;

    4. Are subrogated to all of the rights of the *covered person* against any *third party* to the extent of the benefits paid on the *covered person's* behalf; and

    5. May assert that subrogation right independently of the *covered person*.

E. To take no action that prejudices *our* reimbursement and subrogation rights;

F. To sign, date and deliver to *us* any documents *we* request which protect *our* reimbursement and subrogation rights;

G. To not settle any claim or lawsuit against a *third party* without providing *us* with written notice of the intent to do so;

H. To pay *us* back from any money received from any *third party*, to the extent of benefits *we* paid for the *illness* or *injury*, whether obtained by settlement, judgment, or some other way, and whether or not the *third party's* payment is expressly designated as a payment for medical expenses.

Furthermore *we* may require the *covered person* or the *covered person's* guardian (if the *covered person* is a minor or legally incompetent) to execute a written reimbursement agreement. But, the terms of this provision remain in effect whether or not an agreement is actually signed.

*We* will not pay attorney fees or costs associated with the *covered person's* claim or lawsuit unless *we* previously agreed in writing to do so.

*Our* lien or claim for reimbursement and/or subrogation will be diminished in the same proportion as the *covered person's* claim is diminished if the *covered person* does not recover the full value of his or her claim or lawsuit against a *third party*. However, *we* reserve the right to challenge the valuation of the *covered person's* claim or lawsuit.

If a dispute arises regarding the distribution of the *covered person's* recovery, *we* may pursue *our* rights to resolve the issue to the extent allowed by law. The *covered person* (or the guardian, legal representatives, estate, or heirs of the *covered person*) agrees to place sufficient funds in an escrow or trust account to satisfy the maximum lien amount asserted by *us* until the dispute is resolved.

Definition: As used in this provision, the following term has the meaning indicated:

"*Third party*" means a person or other entity that is or may be obligated or liable to the *covered person* for payment of any of the *covered person's* expenses for *illness* or *injury*. The term "*third party*" includes, but is not limited to, an individual person; a for-profit or non-profit business entity or organization; a government agency or program; and an insurance company, including the covered person's own uninsured or underinsured motorist insurance carrier.

# SECTION 9
# CLAIMS

**NOTICE OF CLAIM:** *We* must receive notice of claim within 30 days of the date the *loss* began or as soon as reasonably possible.

**CLAIM FORMS:** *We* will furnish claim forms after *we* receive notice of a claim. If *our* usual claim forms are not furnished within 15 days *you* or *your* covered *dependent* may file a claim without them. The claim must contain written *proof of loss*.

**PROOF OF LOSS:** *You* or *your* covered *dependent* must give *us* written *proof of loss* within 90 days of the *loss* or as soon as is reasonably possible. Proof furnished more than one year late will not be accepted, unless *you* or *your* covered *dependent* had no legal capacity in that year.

**COOPERATION PROVISION:** When a *loss* occurs, each *covered person* or their representative must promptly:

    A. Sign, date and deliver to *us* an authorization which may be needed to

obtain relevant information from *doctors, hospitals* and other *third parties*;

B. Answer any relevant questions, under oath, which *we* may ask about the *loss*;

C. Give *us* a copy of any relevant document that pertains to the *loss*; and

D. Give *us* any other assistance which *we* may reasonably require to process the claim.

**CUSTODIAL PARENT:** This provision applies if the parents of a covered *eligible child* are divorced or legally separated and both the custodial parent and the non-custodial parent are subject to the same court or administrative order establishing custody. The custodial parent, who is not a *covered person*, will have the rights stated below if *we* receive a copy of the order establishing custody.

Upon request by the custodial parent, *we* will:

A. Provide the custodial parent with information about the terms, conditions benefits, exclusions and limitations of the *policy*;

B. Accept claim forms and requests for claim payment from the custodial parent; and

C. Make claim payments directly to the custodial parent for claims submitted by the custodial parent. Payment of claims to the custodial parent, which are made under this provision, will fully satisfy *our* obligations.

A custodial parent may, with *our* approval, assign claim payments to the *hospital* or *medical practitioner* providing treatment to an *eligible child*.

**TIME FOR PAYMENT OF CLAIMS:** Benefits will be paid as soon as *we* receive proper *proof of loss*.

**PAYMENT OF CLAIMS:** Except as set forth in this provision, all benefits are payable to *you*. Any accrued benefits unpaid at *your* death or *your dependent's* death may, at *our* option, be paid either:

A. To the beneficiary; or

B. To the estate.

If any benefit is payable:

A. To *your* or *your dependent's* estate; or

B. To a beneficiary who:

1. Is a minor; or

2. Is not able to give valid release;

*we* may pay up to $1,000 to any relative who, in *our* opinion, is entitled to it.

*We* may pay all or any part of the benefits provided by the *policy* for *hospital*, surgical, nursing or medical services, directly to the *hospital* or other person rendering such services.

Any payment made by *us* in good faith under this provision shall fully satisfy *our* obligation to the extent of the payment. *We* reserve the right to deduct any overpayment made under the *policy* from any future benefits payable under the *policy*.

**FOREIGN CLAIMS INCURRED FOR EMERGENCY CARE:** Claims incurred outside of the United States for *emergency* care and treatment of a *covered person* must be submitted in English or with an English translation. Foreign claims must include the applicable medical records in English to show proper *proof of loss*.

**PHYSICAL EXAMINATION:** *We* have the right to have *you* or *your* covered *dependent* examined at *our* own expense when and as often as *we* may reasonably require while a claim is pending. *We* also have the right to have an autopsy made where it is not prohibited by law.

**ASSIGNMENT:** *We* will reimburse a *hospital* or health care provider if:

A. *Your* health insurance benefits are assigned by *you* in writing; and

B. *We* approve the assignment.

Any assignment to a *hospital* or person providing the treatment, whether with or without *our* approval, shall not give such *hospital* or person, any right or privilege granted to *you* under the *policy* except for the right to receive benefits, if any, which *we* have determined to be due and payable.

## GOLDEN RULE INSURANCE COMPANY
## OHIO APPEAL PROCEDURES

**DEFINITIONS:** As used in this provision, the following terms have the meanings indicated:

A. "*Adverse benefit determination*" means a decision by a *health plan issuer*:

1. To deny, reduce, or terminate a requested *health care service* or payment in whole or in part, including all of the following:

a. A determination that the *health care service* does not meet the *health*

plan issuer's requirements for *medical necessity*, appropriateness, health care setting, level of care, or effectiveness, including experimental or investigational treatments;

b. A determination of an individual's eligibility for individual health insurance coverage, including coverage offered to individuals through a nonemployer group, to participate in a plan or health insurance coverage;

c. A determination that a *health care service* is not a *covered benefit*;

d. The imposition of an exclusion, including exclusions for preexisting conditions, source of *injury*, network, or any other limitation on *benefits* that would otherwise by covered.

2. Not to issue individual health insurance coverage to an applicant, including coverage offered to individuals through a nonemployer group;

3. To *rescind* coverage on a *health benefit plan*.

B. "*Authorized representative*" means an individual who represents a *covered person* in an internal appeal or external review process of an *adverse benefit determination* who is any of the following:

1. A person to whom a covered individual has given express, written consent to represent that individual in an internal appeals process or external review process of an *adverse benefit determination*;

2. A person authorized by law to provide substituted consent for a *covered person*;

3. A family member or a treating health care professional, but only when the *covered person* is unable to provide consent.

C. "*Covered person*" means a policyholder, subscriber, enrollee, member, or individual covered by a *health benefit plan*. This includes a person who has applied for insurance and who was declined or *rescinded*. *Covered person* does include the *covered person's authorized representative* with regard to an internal appeal or external review.

D. "*Covered benefits*" or "*benefits*" means those health care services to which a covered person is entitled under the terms of a health benefit plan.

E. "*Emergency medical condition*" means a medical condition that manifests itself by such acute symptoms of sufficient severity, including severe pain, that a prudent layperson with an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in any of the following:

1. Placing the health of the *covered person* or, with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy;

2. Serious impairment to bodily functions;

3. Serious dysfunction of any bodily organ or part.

F. "*Emergency services*" means the following:

1. A medical screening examination, as required by federal law, that is within the capability of the emergency department of a *hospital*, including ancillary services routinely available to the emergency department, to evaluate an *emergency medical condition*;

2. Such further medical examination and treatment that are required by federal law to *stabilize* an *emergency medical condition* and are within the capabilities of the staff and facilities available at the *hospital*, including any trauma and burn center of the *hospital*.

G. "*Final adverse benefit determination*" means an *adverse benefit determination* that is upheld or modified at the completion of a *health plan issuer's* internal appeals process.

H. "*Health benefit plan*" means a policy, contract, certificate, or agreement offered by a *health plan issuer* to provide, deliver, arrange for, pay for, or reimburse any of the costs of *health care services*.

I. "*Health care services*" means services for the diagnosis, prevention, treatment, cure, or relief of a health condition, *illness*, *injury*, or disease.

J. "*Health plan issuer*" means an entity subject to the insurance laws and rules of this state, or subject to the jurisdiction of the superintendent of insurance, that contracts, or offers to contract to provide, deliver,

arrange for, pay for, or reimburse any of the costs of *health care services* under a *health benefit plan*, including a sickness and accident insurance company, a health insuring corporation, a fraternal benefit society, a self-funded multiple employer welfare arrangement, or a nonfederal, government health plan. *Health plan issuer* includes a third party administrator to the extent that the *benefits* that such an entity is contracted to administer under a *health benefit plan* are subject to the insurance laws and rules of this state or subject to the jurisdiction of the *superintendent*.

K. "*Independent review organization (IRO)*" means an entity that is accredited to conduct independent external reviews of *adverse benefit determinations*.

L. "*Post-service claim*" means any claim for *benefits* for medical care or treatment that is not a *pre-service claim*.

M. "*Pre-service claim*" means any claim for *benefits* for medical care or treatment that requires the *health plan issuer's* approval in advance of the *covered person* obtaining the medical care.

N. "*Rescind*" means to retroactively cancel or discontinue coverage. *Rescind* does not include cancelling or discontinuing coverage that only has a prospective effect or cancelling or discontinuing coverage that is effective retroactively to the extent it is attributable to a failure to timely pay required premiums or contributions towards the cost of coverage.

O. "*Stabilize*" means the provision of such medical treatment as may be necessary to assure, within reasonable medical probability, that no material deterioration of an individual's medical condition is likely to result from or occur during a transfer, if the medical condition could result in any of the following:

1. Placing the health of the individual or, with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy;

2. Serious impairment to bodily functions;

3. Serious dysfunction of any bodily organ or part.

4. In the case of a woman having contractions, *stabilize* means such medical treatment as may be necessary to delivery, including the placenta.

P. "*Superintendent*" means the superintendent of insurance.

Q. "*Urgent care claim*" means:

1. Any claim that a *doctor* with knowledge of the *covered person's* medical condition determines is an *urgent care claim* to which the application of the time periods for making non-urgent care determinations could seriously jeopardize the life or health of the *covered person* or the ability of the *covered person* to regain maximum function.

2. In the opinion of a *doctor* with knowledge of the claimant's medical condition, any claim for medical care or treatment where the application of the time periods for making non-urgent care determinations would subject the *covered person* to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

3. Any claim for medical care or treatment where the application of the time periods for making non-urgent care determinations could seriously jeopardize the life or health of the *covered person* or the ability of the *covered person* to regain maximum function. Whether a claim is an *urgent care claim* will be determined by an individual acting on behalf of the plan applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine.

R. "*Utilization review*" means a process used to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures or settings. Areas of review may include ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning, or retrospective review.

## INTERNAL APPEALS

### A. Eligibility

Regardless of the cost of the requested *health care service* related to the *adverse benefit determination*, an *adverse benefit determination* shall be eligible for internal appeal.

The *covered person* or their *authorized representative* has 180 days following receipt of an initial notification of an *adverse benefit determination* to file for an internal appeal.

**B. Internal Appeals Process**

The *covered person* has the right to:

1. Submit written comments, documents, records, and other information relating to the claim for *benefits*;

2. Review the claim file and to present evidence and testimony as part of the internal review process;

3. Request reasonable access to, and copies of, all documents, records, and other information relevant to the claim for *benefits* free of charge.

All comments, documents, records and other information submitted by the *covered person* relating to the claim for *benefits*, regardless of whether such information was submitted or considered in the initial benefit determination, will be considered in the internal appeal.

The *covered person* will receive from the *health plan issuer*, new or additional evidence or medical rationale considered by the reviewer **10 calendar days** in advance of the *health plan issuer's* response in order to give the *covered person* time to respond unless the state turnaround time for response is due in less than 10 days.

Review of the internal appeal will be conducted by an individual selected by the *health plan issuer* who was not the individual who made the initial *adverse benefit determination* and is not the subordinate of the original reviewer.

1. If the *adverse benefit determination* is based in whole or in part on a medical judgment, the *health plan issuer* will consult with a health care professional who has appropriate expertise in the field of medicine involved in the medical issue and who was not consulted in connection with the original *adverse benefit determination* to review the internal appeal.

2. If the *adverse benefit determination* is not based in whole or in part on a medical judgment, it will be reviewed by

an impartial person who was not involved in making the original *adverse benefit determination*.

3. If the internal appeal concerns a rescission action, a panel of individuals who were not involved in the original *adverse benefit determination* will review the appeal.

Ongoing treatment or a request for an extension of ongoing treatment cannot be reduced or terminated without the *health plan issuer* providing advance notice and an opportunity for advance review to the *covered person*. The *health plan issuer* is required to provide continued coverage pending the outcome of an internal appeal. A person may request an internal appeal and external review be conducted simultaneously for an ongoing course of treatment involving *urgent care*.

1. Resolution Timeframes

   a. *Post-service claim appeals*: The *health plan issuer* will notify the *covered person* in writing with the appeal decision within **60 days** after receipt of the *covered person's* request for internal appeal.

   b. *Pre-service claim appeals*: The *health plan issuer* will notify the *covered person* in writing with the appeal decision within **30 days** after receipt of the *covered person's* request for internal appeal.

   c. *Urgent care appeals*: The *health plan issuer* will notify the *covered person* within **72 hours** of request for internal appeal that is a notification involving *urgent care*.

2. Written Response

   The *health plan issuer* will provide the *final adverse benefit determination* in writing with the following:

   a. The specific reason or reasons for the *adverse benefit determination*;

   b. Reference to the specific plan provision on which the determination is based;

   c. A description of an additional material or information necessary for the *covered person* to perfect

the claim and an explanation of why such material or information is necessary;

d. Enclose the Notice of Appeal and External Review Rights which will list the right to request and a description of both the standard and expedited external review procedures, including:

   i. Information regarding how to initiate an external review, highlighted provisions that give the *covered person* the opportunity to submit additional information; and

   ii. Information that the *covered person* may have a right to bring a civil action under state or federal law;

e. The specific rule, guideline, protocol, or other similar criterion, if used to make the determination, or that it will be provided free of charge upon request;

f. The medical judgment applying the terms of the plan to the *covered person's* medical circumstances, or a statement that such explanation will be provided free of charge upon request;

g. The identification of medical experts whose advice was obtained on *our* behalf, without regard to whether the advice was relied upon in making the *adverse benefit determination*;

h. The date of service;

i. The health care provider's name;

j. The claim amount;

k. The diagnosis and procedure codes with their corresponding meanings, or an explanation that the diagnosis and/or procedure codes are available upon request;

l. The *health plan issuer's* denial code with corresponding meaning;

m. A description of any standard used, if any, in denying the claim;

n. That assistance is available by contacting the specific state's consumer assistance department;

o. A culturally linguistic statement based upon the *covered person's* county or state of residence that provides for oral translation of the *adverse benefit determination*;

p. Any forms used to process an external review, including a copy of the form that authorizes the *health plan issuer* and the *covered person's* treating health care provider to disclose protected health information including medical records, concerning the *covered person* that are related in any manner to the external review;

q. Statements informing the *covered person*:

   i. Requests for external review must be made in writing, including by electronic means, and must be submitted to the *health plan issuer* within 180 days after the date of the notice of *final adverse benefit determination*. In the case of an expedited review, the request may be submitted orally.

   ii. If the *covered person's* treating *doctor* certifies that the *covered person* has a medical condition for which the time frame for completion of a standard external review would seriously jeopardize the life or health of the *covered person* or would jeopardize the *covered person's* ability to regain maximum function, the *covered person* may file a request for an expedited external review;

   iii. If the *final adverse benefit determination* concerns a *health care service* for which the *covered person* received *emergency services*, but has not been discharged from a facility, the *covered person* may request an expedited external review;

   iv. If the *final adverse benefit determination* concerns denial of coverage based on a determination that the recommended or requested *health care service* or treatment is experimental or

investigational, the *covered person* may file a request for an external review to be conducted, or if the *covered person's* treating *doctor* certifies that the recommended or requested *health care service* that is the subject of the request would be significantly less effective if not promptly initiated, the *covered person* may request an expedited external review to be conducted.

r.  The following statement:

If your claim has been denied based on a determination that the health care service does not meet the *health plan issuer's* requirements for medical necessity, appropriateness, health care setting, level of care, or effectiveness, including experimental or investigational treatments, you may have a right to request an independent review by an outside medical practitioner. Submit your written request and authorization to release medical records to: Grievance Administrator, PO Box 31371, Salt Lake City, UT 84131-0371.

If your claim has been denied based on a determination that you are not eligible to participate in the plan, a health care service is not a covered benefit, a plan exclusion or a benefit limitation applies, or your coverage is rescinded, you have the right to file a complaint with the Ohio Department of Insurance. ATTN: Consumer Affairs, 50 West Town Street, Suite 300, Columbus, OH 43215. (614) 644-2673. Toll free in Ohio (800) 686-1526. Complaints may also be filed via the internet at http://insurance.ohio.gov.

## EXTERNAL REVIEWS

### A.  General Information

Regardless of the cost of the requested *health care service* related to the *adverse benefit determination*, an *adverse benefit determination* shall be eligible for external review.

Review of a *final adverse benefit determination* shall be through an external review.

Eligible requestor/appellant:

1.  The *covered person*.

2.  The *covered person's* authorized representative.

The *health plan issuer* will afford the opportunity for an external review by:

1.  An independent review organization for an *adverse benefit determination* if the determination involved a medical judgment or if the decision was based on any medical information. Relevant procedures and eligibility criteria are described in the following sections:

    a.  Section C.3. for a standard review;

    b.  Section C.4. for an expedited review;

    c.  Section C.5 for reviews involving experimental procedures.

2.  The superintendent in the following situations:

    a.  For an *adverse benefit determination* based on a contractual issue that did not involve a medical judgment or any medical information.

    b.  For an *adverse benefit determination* in which emergency medical services have been determined to be not *medically necessary* or appropriate after an external review by an *IRO*.

Relevant procedures and eligibility criteria are described in section C.6.

An external review decision is binding on the *covered person* and on the *health plan issuer* except to the extent either has other remedies available under applicable state law, or unless the *superintendent* determines that, due to the facts and circumstances of an external review, a second external review is required.

A *covered person* may not file a subsequent request for external review involving the same *adverse benefit determination* for which the *covered person* has already received an external review

decision, except in the event that new medical or scientific evidence is submitted to *us*.

No *covered person* shall be required to pay for any part of the cost of the external review. The *health plan issuer* will pay the cost of the external review, including the cost of any external review that is required at the direction of the *superintendent*. If the *superintendent* that, due to the facts and circumstances of an external review, a second external review is required, the *health plan issuer* will pay the costs of the second review.

**B. Assignment of an *IRO***

When a *covered person's* request for an external review is accepted, and if the determination requires a medical judgment or a determination based on medical information, the review shall be conducted by an *IRO* assigned by the *superintendent*.

The Ohio Department of Insurance (ODI) has created a website designed to randomly select two *IROs* from the list of approved organizations maintained by the *superintendent* to perform the external review. An *IRO* that has a conflict of interest with the *health plan issuer*, the *covered person*, the health care provider, or the health care facility will not be selected to conduct the review. The selection of the *IRO* through the website provides notification to the *superintendent* that an *IRO* request has been made.

**C. Standard (non-expedited) External Review**

The provisions of this section apply **only** to standard reviews, which are not expedited and do not involve an experimental or investigational treatment.

1. Standard External Review Eligibility

The *health plan issuer* is not required to grant a request for a standard external review until the *covered person* has exhausted the *health plan issuer's* internal appeal process.

**Exception:** A request for an external review of an *adverse benefit determination* may be made before the *covered person* has exhausted the internal appeals procedures whenever

the *health plan issuer* agrees to waive the exhaustion requirement. If the internal appeal process is waived, the *covered person* may file a request in writing for a standard external review.

A *covered person* shall not make a request for an external review of an *adverse benefit determination* involving a retrospective review determination made pursuant to a *utilization review* until the *covered person* has exhausted the internal appeals process.

An internal appeal process shall be considered exhausted when:

a. A *covered person* has requested an internal appeal and has not received a written decision from the *health plan issuer* within the required timeframe; or

b. The *health plan issuer* fails to adhere to all requirements of the internal appeals process.

The internal appeals process will not be deemed exhausted based on minor violations that do not cause, and are not likely to cause, prejudice or harm to the *covered person* so long as the *health plan issuer* demonstrates that the violation was for good cause or due to matters beyond the *health plan issuer's* control and that the violation occurred in the context of an ongoing, good faith exchange of information between the *health plan issuer* and the *covered person*, and is not reflective of a pattern or practice of noncompliance, except that:

a. If the *health plan issuer* denies a request for external review under this section, the *covered person* may request written explanation and the *health plan issuer* will provide the explanation within **10 days**, including a specific description of the *health plan issuer's* basis, if any, for asserting that the delay should not cause the internal appeals process to be considered exhausted;

b. The *covered person* may request review by the *superintendent* of the *health plan issuer's* explanation and if the *superintendent* affirms the *health plan issuer's* explanation, the

*covered person* may, within 10 days of the *superintendent's* notice of decision, resubmit and pursue the internal appeal process. Timeframes for re-filing the internal appeal shall begin to run upon receipt of such notice by the *covered person*.

2. <u>Standard External Review Process</u>

All requests for standard external review shall be made in writing, including by electronic means, by the *covered person* to the *health plan issuer* within 180 days of the date of the *final adverse benefit determination*.

Upon receipt of a request for an external review form a *covered person*, the *health plan issuer* will review it for eligibility. If the request is eligible and complete, the *health plan issuer* will:

a. Initiate an external review.

b. Send written notification to the *covered person* indicating acceptance. The notification shall include both of the following:

   i. The name and contact information for the assigned *IRO* or the *superintendent*, as applicable, for the purpose of submitting additional information;

   ii. A statement that the *covered person* may, within 10 business days after the date of receipt of the notice, submit, in writing, additional information for either the *IRO* or the *superintendent* to consider when conducting the external review. The assigned *IRO* is not required to, but may, accept and consider information submitted by the *covered person* after that timeframe.

If the *health plan issuer* denies a request for an external review on the basis *adverse benefit determination* is not eligible for an external review, the *covered person* may appeal the denial to the *superintendent*. When such a denial is made, the *health plan issuer* will notify the *covered person* in writing of both the reason for denial and their right to appeal the denial to the *superintendent* along with the Request for Review by the Ohio Department of Insurance form to appeal the *health plan issuer's* external review request denial.

Regardless of a determination made by the *health plan issuer*, the *superintendent* may determine that a request is eligible for external review. The *superintendent's* determination shall be made in accordance with the terms of the *covered person's health benefit plan* and shall be subject to all applicable provisions in Ohio Statutes.

Within **five days** after the receipt of a request for an external review that is complete and valid, the *health plan issuer* will provide to the assigned *IRO* all documents and information considered in making the *adverse benefit determination*. An external review shall not be delayed due to failure on the *health plan issuer's* part to provide this required information.

3. An *IRO* may reverse an *adverse benefit determination* if the required information is not provided in the allotted time. If an *adverse benefit determination* is reversed for this reason, within one business day of making the decision, the *IRO* shall notify the *covered person*, the *superintendent*, and *us*.

4. The *IRO* may also grant a request from the *health plan issuer* for more time to provide the required information.

An *IRO* shall forward upon receipt a copy to the *health plan issuer* of any additional information received from a *covered person*. Upon receipt of that information, the *health plan issuer* may reconsider the *adverse benefit determination* and provide coverage for the health service in question. The *health plan issuer's* reconsideration of an *adverse benefit determination* based upon receipt of information under this section shall not delay or terminate an external review. If the *health plan issuer* reverses and *adverse benefit determination* under this section, the *health plan issuer* will notify, in writing and within **one business day** of making such a decision, the *covered person*, the assigned *IRO,* and the

*superintendent*. Upon receipt of such a notification, the assigned *IRO* will terminate the associated external review.

An *IRO* assigned to review an *adverse benefit determination* shall provide written notice of its decision to either uphold or reverse the determination within 30 days of receipt by the *health plan issuer* of a request for a standard external review. The written notice shall be sent to the *covered person*, the *superintendent*, and *us*.

Upon receipt of a notice by an *IRO* to reverse the *adverse benefit determination*, the *health plan issuer* will **immediately** provide coverage for the *health care service* or services in question.

### D. Expedited External Review

The provisions of this section apply **only** to expedited external reviews that do not involve an experimental or investigational treatment.

1. Expedited External Review Eligibility

   An expedited external review may not be provided for retrospective *final adverse benefit determinations*.

   A *covered person* may make a request for an expedited external review:

   a. After an *adverse benefit determination*, if both of the following apply:

      i. The *covered person's* treating *doctor* certifies that the *adverse benefit determination* involves a medical condition that could seriously jeopardize the life or health of the *covered person* or jeopardize the *covered person's* ability to regain maximum function if treated after the timeframe of an expedited internal appeal, the *covered person* may request an expedited external review to be conducted simultaneously with an expedited internal appeal.

      ii. The *covered person* has filed a request for an expedited internal appeal.

   b. After a *final adverse benefit determination*, if either of the following apply:

      i. The *covered person's* treating *doctor* certifies that the *adverse benefit determination* involves a medical condition that could seriously jeopardize the life or health of the *covered person*, or would jeopardize the *covered person's* ability to regain maximum function, if treated after the timeframe of a standard external review;

      ii. The *final adverse benefit determination* concerns an admission, availability of care, continued stay, or *health care service* for which the *covered person* received *emergency services*, but has not yet been discharged from a facility.

   c. If the *covered person* requested an internal appeal and the *health plan issuer* has not issued a written decision within 72 hours, and the *covered person* has not requested or agreed to a delay, the *covered person* may be considered to have exhausted the internal appeal process and may file a request for an expedited external review.

2. Expedited External Review Process

   Requests for an expedited external review may be requested orally.

   **Immediately** upon receipt of a request for an expedited external review from a *covered person*, the *health plan issuer* will determine if the request is eligible for expedited external review under section C.4.a. If the request is eligible and complete, the *health plan issuer* will:

   a. Initiate an external review.

   b. **Immediately** notify the *covered person* of acceptance. The notification shall include the name and contact information for the assigned *IRO* or the *superintendent*, as applicable, for the purpose of submitting additional information.

If the *health plan issuer* denies a request for an external review on the basis *adverse benefit determination* is not eligible for an external review, the *covered person* may appeal the denial to the *superintendent*. When such a denial is made, the *health plan issuer* will notify the *covered person* in writing of both the reason for the denial and their right to appeal the denial to the *superintendent* along with the Request for Review by the Ohio Department of Insurance form to appeal the *health plan issuer's* external review request denial.

Regardless of a determination made by the *health plan issuer*, the *superintendent* may determine that a request is eligible for external review. The *superintendent's* determination shall be made in accordance with the terms of the *covered person's health benefit plan* and shall be subject to all applicable provisions in Ohio Statutes.

When a request for an expedited external review is complete and eligible, the *health plan issuer* will **immediately** provide or transmit all necessary documents and information considered in making the *adverse benefit determination* in question to the assigned *IRO* electronically, or by facsimile or other available expeditious method. If the *health plan issuer* fails to provide the required documents and information, the *IRO* shall not delay the external review and may accordingly reverse the *adverse benefit determination.*

As expeditiously as the *covered person's* medical condition requires, but no more than 72 hours after receipt by the *health plan issuer* of a request for an expedited external review, the assigned *IRO* shall uphold or reverse the *adverse benefit determination*. The *IRO* shall promptly notify the *covered person*, *superintendent*, and the *health plan issuer* of the decision. If such a notice is not made in writing, the *IRO* shall provide written documentation of its decision to the *covered person*, *superintendent,* and the *health plan issuer* within 48 hours of making the decision.

Upon receipt of a notice by an *IRO* to reverse the *adverse benefit determination*, the *health plan issuer* will **immediately** provide coverage for the *health care service* or services in question.

E. **Experimental or Investigational Treatment-related External Reviews**

The provisions of this section apply **only** to external reviews that involve an experimental or investigational treatment.

1. Standard External Review for Experimental or Investigational Treatment

   a. Standard Experimental or Investigational External Review Eligibility

   The *health plan issuer* is not required to grant a request for a standard external review until the *covered person* has exhausted the *health plan issuer's* internal appeal process.

   **Exception:** A request for an external review of an *adverse benefit determination* may be made before the *covered person* has exhausted the internal appeals procedures whenever the *health plan issuer* agrees to waive the exhaustion requirement. If the internal appeal process is waived, the *covered person* may file a request in writing for a standard external review.

   A *covered person* shall not make a request for an external review of an *adverse benefit determination* involving a retrospective review determination made pursuant to a *utilization review* until the *covered person* has exhausted the internal appeals process.

   An internal appeal process hall be considered exhausted when:

   i. A *covered person* has requested an internal appeal and has not received a written decision from the *health plan issuer* within the required timeframe; or

   ii. The *health plan issuer* fails to adhere to all requirements of the internal appeals process.

The internal appeals process will not be deemed exhausted based on minor violations that do not cause, and are not likely to cause, prejudice or harm to the *covered person* so long as the *health plan issuer* demonstrates that the violation was for good cause or due to matters beyond the *health plan issuer's* control and that the violation occurred in the context of an ongoing, good faith exchange of information between the *health plan issuer* and the *covered person*, and is not reflective of a pattern or practice of noncompliance, except that:

i. If the *health plan issuer* denies a request for external review under this section, the *covered person* may request written explanation and the *health plan issuer* will provide the explanation within **10 days**, including a specific description of the *health plan issuer's* basis, if any, for asserting that the delay should not cause the internal appeals process to be considered exhausted;

ii. The *covered person* may request review by the *superintendent* of the *health plan issuer's* explanation and if the *superintendent* affirms the *health plan issuer* explanation, the *covered person* may, within 10 days of the *superintendent's* notice of decision, resubmit and pursue the internal appeal process. Timeframes for re-filing the internal appeal shall begin to run upon receipt of such notice by the *covered person*.

A *covered person* may request an external review of an *adverse benefit determination* based on the conclusion that a requested *health care service* is experimental or investigational, except when the requested *health care service* is explicitly listed as an excluded benefit under the *covered person's health benefit plan*.

To be eligible for an external review under this section, a *covered person's* treating *doctor* shall certify that one of the following situations is applicable:

i. Standard *health care services* have not been effective in improving the condition of the *covered person*;

ii. Standard *health care services* are not medically appropriate for the *covered person*;

iii. There is no available standard *health care service* covered by the *health plan issuer* that is more beneficial than the requested *health care service*.

b. Standard Experimental or Investigational External Review Process

All requests for standard external review of experimental or investigational treatment shall be made in writing, including by electronic means, by the *covered person* to the *health plan issuer* within 180 days of the date of the *final adverse benefit determination*.

Upon receipt of a request for an external review from a *covered person*, the *health plan issuer* will review it for eligibility. If the request is eligible and complete, the *health plan issuer* will:

i. Initiate an external review.

ii. Send written notification to the *covered person* indicating acceptance. The notification shall include both of the following:

a. The name and contact information for the assigned *IRO* or the *superintendent*, as applicable, for the purpose of submitting additional information;

b. A statement that the *covered person* may, within 10 business days after the date of receipt of the notice, submit, in writing, additional information for either the *IRO* or the *superintendent* to consider when conducting the external review. The assigned *IRO* is not

required to, but may, accept and consider information submitted by the *covered person* after that timeframe.

If the *health plan issuer* denies a request for an external review on the basis the *adverse benefit determination* is not eligible for an external review, the *covered person* may appeal the denial to the *superintendent*. When such a denial is made, the *health plan issuer* will notify the *covered person* in writing of both the reason for the denial and their right to appeal the denial to the *superintendent* along with the Request for Review by the Ohio Department of Insurance form to appeal the *health plan issuer's* external review request denial.

Regardless of a determination made by the *health plan issuer*, the *superintendent* may determine that a request is eligible for external review. The *superintendent's* determination shall be made in accordance with the terms of the *covered person's health benefit plan* and shall be subject to all applicable provisions in Ohio Statutes.

Within **five days** after the receipt of a request for an external review that is complete and valid, the *health plan issuer* will provide to the assigned *IRO* all documents and information considered in making the *adverse benefit determination*. An external review shall not be delayed due to failure on the *health plan issuer's* part to provide this required information.

i.  An *IRO* may reverse an *adverse benefit determination* if the required information is not provided in the allotted time. If an *adverse benefit determination* is reversed for this reason, the *IRO* shall immediately notify the *covered person*, the *superintendent*, and *us*.

ii. The *IRO* may also grant a request from the *health plan*

*issuer* for more time to provide the required information.

Within one business day of receipt, an *IRO* shall forward a copy to the *health plan issuer* of any additional information received from a *covered person*. Upon receipt of that information, the *health plan issuer* may reconsider the *adverse benefit determination* and provide coverage for the health service in question. The *health plan issuer's* reconsideration of an *adverse benefit determination* based upon receipt of information under this section shall not delay or terminate an external review. If the *health plan issuer* reverses an *adverse benefit determination* under this section, the *health plan issuer* will notify, in writing and within **one business day** of making such a decision, the *covered person* the assigned *IRO* will terminate the associated external review.

An *IRO* assigned to review an *adverse benefit determination* shall provide written notice of its decision to either uphold or reverse the determination within 30 days of receipt by the *health plan issuer* of a request for a standard external review. The written notice shall be sent to the *covered person*, the *superintendent*, and *us*.

Upon receipt of a notice by an *IRO* to reverse the *adverse benefit determination*, the *health plan issuer* will **immediately** provide coverage for the *health care service* or services in question.

2.  Expedited External Review for Experimental or Investigational Treatment

a.  Expedited Experimental or Investigational External Review Eligibility

A *covered person* may orally or by electronic means request an expedited external review of an *adverse benefit determination* based on the conclusion that a requested *health care service* is experimental or investigational if the person's treating *doctor* certifies

that the requested *health care service* in question would be significantly less effective if not promptly initiated; **except** when the requested *health care service* is explicitly listed as an excluded benefit under the *covered person's health benefit plan*.

If the *covered person* requested an internal appeal and the *health plan issuer* has not issued a written decision within 72 hours, and the *covered person* has not requested or agreed to a delay, the *covered person* may be considered to have exhausted the internal appeal process and may file a request for an expedited external review.

b. Expedited Experimental or Investigational External Review Process

Requests for an expedited external review may be requested orally or electronically.

**Immediately** upon receipt of a request for an expedited external review, the *health plan issuer* will determine if the request is eligible. If the request is eligible and complete, the *health plan issuer* will:

i. Initiate an external review.

ii. **Immediately** notify the *covered person* of acceptance. The notification shall include the name and contact information for the assigned *IRO* or the *superintendent*, as applicable, for the purpose of submitting additional information.

If the *health plan issuer* denies a request for an external review on the basis the *adverse benefit determination* is not eligible for an external review, the *covered person* may appeal the denial to the *superintendent*. When such a denial is made, the *health plan issuer* will notify the *covered person* in writing of both the reason for the denial and their right to appeal the denial to the *superintendent* along with the Request for Review by the Ohio Department of Insurance form

to appeal the *health plan issuer's* external review request denial.

Regardless of a determination made by the *health plan issuer*, the *superintendent* may determine that a request is eligible for external review. The *superintendent's* determination shall be made in accordance with the terms of the *covered person's health benefit plan* and shall be subject to all applicable provisions in Ohio Statutes.

When a request for an expedited external review is complete and eligible, the *health plan issuer* will **immediately** provide or transmit all necessary documents and information considered in making the *adverse benefit determination* in question to the assigned *IRO* electronically, or by facsimile or other available expeditious method. An external review shall not be delayed due to failure on the *health plan issuer's* part to provide the required information:

i. An *IRO* may reverse an *adverse benefit determination* if the required information is not provided in the allotted time. If an *adverse benefit determination* is reversed for this reason, the *IRO* shall immediately notify the *covered person*, the *superintendent*, and *us*.

ii. The *IRO* may also grant a request from the *health plan issuer* for more time to provide the required information.

An *IRO* assigned to review an *adverse benefit determination* shall provide written notice of its decision to either uphold or reverse the determination within 72 hours of receipt by the *health plan issuer* of a request for an expedited external review. The written notice shall be sent to the *covered person*, the *superintendent*, and *us*.

Upon receipt of a notice by an *IRO* to reverse the *adverse benefit determination*, the *health plan issuer* will **immediately** provide

coverage for the *health care service* or services in question.

## F. External Review for Contractual Issues

The *health plan issuer* will afford the opportunity for an external review by the *superintendent* for an *adverse benefit determination* based on a contractual issue that did not involve a medical judgment or any medical information.

**Exception:** For an *adverse benefit determination* in which emergency medical services have been determined to be not *medically necessary* or appropriate after an external review, the *health plan issuer* will afford the *covered person* the opportunity for an external review by the *superintendent*, based on the prudent layperson standard.

The *covered person* must have exhausted the *health plan issuer's* internal appeal process for the *superintendent* to conduct this type of review.

Within **five calendar days** of receiving a request for external contractual review, the *health plan issuer* will submit the request for external review to the *superintendent*. The request will include the following documents and records:

1. An explanation of the *covered person's* plan type;

2. An explanatory summary of the claims and appeals;

3. The claims submitted by the provider in relation to the *adverse benefit determination* being reviewed;

4. All explanations of benefits related to the claims that are the subject of the *adverse benefit determination* being reviewed.

5. All correspondence, including emails, related to the claims that are the subject of the *adverse benefit determination* being reviewed;

6. All telephone records, including transcripts, recordings or tracking notes in existence that are related to the claims that are the subject of the *adverse benefit determination* being reviewed; and

7. The complete health benefit policy related to the claims that are the subject of the *adverse benefit determination* being reviewed.

If the *superintendent* requests additional specific information, the *health plan issuer* must submit the information to the *superintendent* within **the time specified by the *superintendent*, or not later than 10 calendar days** of receiving the information request. A *health plan issuer's* request for an extension to this deadline must be submitted in writing prior to the applicable deadline. The *superintendent* has discretion to accept information from a *covered person* at any time during the external review process.

A *health plan issuer's* incomplete provision or late submission of information will not impact the *superintendent's* duty to provide a prompt external review. If a *health plan issuer* fails to provide information timely, the *superintendent* will consider only that information supplied prior to the expiration of the applicability deadline.

A *health plan issuer* may reconsider its *adverse benefit determination* at any time. Reconsideration does not suspend or terminate the *superintendent's* external contractual review. If a *health plan issuer* reverses its determination, it must provide written notice of its reversal within **one business day** of its decision to the *covered person* and the *superintendent*. Once revised explanations of benefits are issued, the *health plan issuer* must promptly forward copies to the *superintendent*. Upon receipt of the revised explanations of benefits showing that the claims at issue have been appropriately covered, the *superintendent* will terminate the external contractual review.

On receipt of a request from the *health plan issuer*, the *superintendent* shall determine whether the *health care service* is a service covered under the terms of the *covered person's* policy, contract, certificate, or agreement, unless the *superintendent* is not able to do so because making the determination requires a medical judgment or a determination based on medical information.

The *superintendent* shall notify the *covered person* and the *health plan issuer* of the determination.

1. If the *superintendent* notifies the *health plan issuer* that making the determination requires a medical judgment or a determination based on medical information, the *health plan issuer* will initiate an external review by an *IRO*.

2. If the *superintendent* determines that the health services is a covered service, the *health plan issuer* will cover the service.

3. If the *superintendent* determines that the *health care service* is not a covered service, the *health plan issuer* is not required to cover the service or afford the *covered person* an external review by an *IRO*.

If the *superintendent* overturns the *adverse benefit determination*, the *health plan issuer* must, **as soon as reasonably practicable, but not more than 15 calendar days** from the date the issuer is notified of the determination, cover the services according to the terms of the plan or avail themselves of any additional remedies that may apply. An external review decision is binding on the *health plan issuer* and *covered person*, except to the extent there are other remedies available under applicable state law, or unless the *superintendent* determines that, due to the facts and circumstances of an external review, a second external review is required.

Administrative error during the *health plan issuer's* internal appeal process, including misapplication of the terms of the *covered person's* health plan, failure to submit timely all relevant information, or failure to correctly apply medical necessity criteria, are not circumstances that the *superintendent* would consider as warranting a second external review.

## CONTACT INFORMATION

If the *covered person* has questions about their rights or needs assistance, they may contact the Ohio Department of Insurance:

Ohio Department of Insurance
ATTN: Consumer Affairs
50 West Town Street
Suite 300
Columbus, OH 43215

Phone numbers: (800} 686-1526 \ (614) 644-2673
TDD number: (614) 644-3745

Fax number: (614) 644-3744

Contact ODI Consumer Affairs:

https://secured.insurance.ohio.gov/ConsumerServ/ConServComments.asp

File a Consumer Complaint:

http://insurance.ohio.gov/Consumer/OCS/Pages/ConsCompl.aspx

## UNIFORM PROVISIONS

**CONTRACT:** The entire contract between the *policyholder* and *us* consists of:

A. The *policy*;

B. The certificates;

C. The applications of the *policyholder* and the persons insured; and

D. Riders issued to certificateholders.

All statements contained in the applications will, in the absence of fraud, be deemed representations and not warranties. No statement made by an applicant for insurance will be used to void the insurance or reduce the benefits, unless contained in a written application which is signed by the applicant.

No agent may:

A. Change the *policy*;

B. Waive any provisions of the *policy*;

C. Extend the time for payment of premiums; or

D. Waive any of *our* rights or requirements.

Other than riders issued to certificateholders, no change in the *policy* will be valid unless it is:

A. Noted on or attached to the *policy*;

B. Signed by one of *our* officers; and

C. Delivered to the *policyholder*.

**NON-WAIVER:** If *we* or *you* fail to enforce or to insist on strict compliance with any of the terms, conditions, limitations or exclusions of the *policy*, that will not be considered a waiver of any rights under the *policy*. A past failure to strictly enforce the *policy* will not be a waiver of any rights in the future, even in the same situation or set of facts.

**MISSTATEMENT IN APPLICATION:** A misstatement in the application for coverage may be used to void coverage and/or deny or reduce a

claim for *loss* incurred within 24 months of the effective date of coverage under the *policy*.

After 24 months following the effective date of coverage under the *policy*, no misstatement, except for a fraudulent misstatement, may be used to void or reduce *your* coverage and/or deny a claim for *loss* incurred under the *policy*.

**RESCISSIONS:** *We* may not rescind *your* coverage based on a misrepresentation on the application or enrollment form for coverage unless:

A. The misrepresentation was intentionally made by *you* or a person seeking coverage on *your* behalf: and

B. The misrepresentation was material to the risk

*We* must provide at least 30 days advance written notice before *your* coverage may be rescinded. *You* have the right to appeal any such rescission.

**LEGAL ACTION:** No action at law or in equity may be brought to recover reimbursement under the *policy* prior to the expiration of 60 days after written *proof of loss* has been furnished in accordance with the requirements of the *policy*. No such action may be brought after the expiration of three years after the time written *proof of loss* is required to be furnished.

No action at law or in equity may be brought against *us* under the *policy* for any reason unless *you*, the *covered person* first completes all the steps in the complaint/grievance procedures made available to resolve disputes in *your* state under the *policy*.

After completing that complaint/grievance procedures process, if *you* want to bring legal action against *us* on that dispute, *you* must do so within three years of the date *we* notified *you* of the final decision on *your* complaint/grievance.

**CONFORMITY WITH STATE STATUTES:** The *policy* will be interpreted by the laws of the state in which it is delivered. Any part of the *policy* which is in conflict with the laws of the state in which it is delivered is changed to conform to the minimum requirements of that state's laws.

## OUTPATIENT PRESCRIPTION DRUG EXPENSE BENEFITS RIDER

This rider is effective at the same time as the *policy*/certificate.

By attachment of this rider, *covered expenses* under the *policy*/certificate are expanded to include the charges incurred by a *covered person* for outpatient *prescription drugs* as stated in this rider.

**COVERED EXPENSES:** *Covered expenses* for outpatient *prescription drugs* are limited to charges from a licensed pharmacy for drugs that, under applicable state law, may be dispensed only upon the written prescription of a *doctor*.

*Covered expenses* include the charges for an accepted off-label use of a drug approved by the United State Food and Drug Administration, as described in the definition of *experimental or investigation treatment* in the Definitions section.

**Off-Label Drugs for the Treatment of Cancer:** *Covered expenses* shall include any drug approved by the United States Food and Drug Administration (*USFDA*) for the treatment of cancer, even if not approved for the specific type of cancer for which the drug has been prescribed if:

A. The drug has been recognized as safe and effective for treatment of that specific type of cancer in any of the following standard reference compendia, unless the use is identified as not indicated in one or more of these standard reference compendia:

1. The American Hospital Formulary Services Drug Information;

2. The National Comprehensive Cancer Network Drugs and Biologics Compendium;

3. The Elsevier Gold Standard's Clinical Pharmacology; or

4. Other authoritative compendia as identified by the Secretary of the United States Department of Health and Human Services or the Commissioner, at our discretion.

B. The drug has been recognized as safe and effective for treatment of that specific type of cancer in two articles from medical literature that have not had their recognition of the drug's safety and effectiveness contradicted by clear and convincing evidence presented in another article from medical literature.

If the drug is deemed to have met this criteria, the drug will be considered a *covered expense,* regardless of whether administered orally, intravenously or by injection.

*Covered expenses* shall not include the charges for any drug for which the *USFDA* has determined its use to be contraindicated for the treatment of the specific type of cancer for which the drug has been prescribed.

**MEMBER PHARMACIES:** For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is used, *we* will pay the charges at the negotiated rate, subject to the *prescription drug copayment amount* or the *deductible amount* and *coinsurance percentage* shown in the Data Page, whichever is applicable. For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is not used, charges will be treated the same as any other medical *covered expense* incurred at a non-*network provider*. This may be less than the expense incurred by the *covered person* for the *prescription order*.

**NON-MEMBER PHARMACIES:** For *covered expenses* that are incurred at a non-*member pharmacy*, charges will be treated the same as any other medical *covered expense* incurred at a non-*network provider*. This may be less than the expense incurred by the *covered person* for the *prescription order*.

**NOTICE AND PROOF OF LOSS:** In order to obtain payment for *covered expenses* incurred at a non-*member pharmacy* or at a *member pharmacy* when *your* health insurance card is not used, notice of claim and *proof of loss* must be submitted directly to *us*. For *covered expenses* incurred at a *member pharmacy* when *your* health insurance card is used, the *member pharmacy* has agreed to file necessary notice of claim and *proof of loss* with *our* pharmacy benefits manager.

**TIER ASSIGNMENTS:** The cost sharing for a *prescription drug* is determined by the tier to which the *prescription drug* is assigned. United Healthcare's Prescription Drug List Management Committee (*"PDLMC"*) assigns each *prescription drug* to a tier. *You* can find the tier status for a *prescription drug* by accessing *your* prescription benefits on *our* website or by calling the telephone number on *your* health insurance identification card.

**TIER CHANGES:** The *PDLMC* determines changes in tier placement over time. They consider multiple factors including, but not limited to, clinical and economic factors. Clinical factors may include, but are not limited to, evaluation of the place in therapy, relative safety or relative efficacy of the *prescription drug,* as well as whether supply limits should apply. Economic factors may include, but are not limited to, the *prescription drug's* acquisition cost including, but not limited to, available rebates and assessments on the cost effectiveness of the *prescription drug.* The tier to which a *prescription drug* is assigned may change periodically. These changes generally occur quarterly. If a *prescription drug's* tier changes, the cost sharing may change and *you* may be required to pay more or less for the *prescription drug.*

Some *prescription drugs* are more cost effective for treatment of specific indications as compared to others. So, a *prescription drug* may be listed on multiple tiers, depending on the condition for which the *prescription drug* was prescribed.

**PRESCRIPTION DRUG LIST:** *Covered expenses* for *prescription drugs* are limited to those included in the Prescription Drug List (*"PDL"*) provided by *our* pharmacy benefits manager, OptumRx, at the time *your prescription order* is filled (formulary drugs). The *PDL* is determined by the UnitedHealthcare Prescription Drug List Management Committee comprised of senior level UnitedHealth Group physicians and business leaders. Their goal is to help ensure access to a wide range of medications while helping to control health care costs. As affiliates of UnitedHealthcare, both *we* and OptumRx use this *PDL* to administer *prescription drug* benefits.

*You* may be entitled to benefits for a *prescription drug* not included in the *PDL* (non-formulary drugs) without any added cost sharing beyond that required of formulary drugs if:

    A.  After consultation with *your doctor, we* determine that the formulary drugs are inappropriate therapy for *your* condition; or

    B.  *You* have been using the non-formulary drug for 6 months prior to its exclusion from the *PDL,* and *your doctor* determines that either the formulary drug is inappropriate therapy for *your* condition or that changing the drug therapy presents a significant health risk.

**SUPPLY LIMITS:** *Prescription drugs* are subject to supply limits, which may restrict the amount dispensed per *prescription order* or the amount dispensed per month's supply. For the stated cost sharing amount, *you* may receive a *prescription drug* in quantities up to the stated supply limit. Supply limits are subject to review and may change periodically. *You* may determine the supply limits applicable to a particular *prescription drug* by calling the telephone number on *your* health insurance identification card.

**DESIGNATED PHARMACIES:** For certain *prescription drugs*, including, but not limited to, *specialty prescription drugs*, *we* may direct *you* to a *designated pharmacy.* If *you* choose not to obtain *your prescription drug* from the *designated pharmacy* to which *you* are directed, no benefits will be payable for that *prescription drug.*

**THERAPEUTIC CLASS/THERAPEUTIC EQUIVALENT MAXIMUM ALLOWABLE CHARGE:** *We* may determine a maximum allowable charge for *prescription drugs* in a particular *therapeutic class* or that are *therapeutically equivalent.* If *you* or *your medical practitioner* elect a *prescription drug* included in the same class that is more than the maximum allowable charge assigned, *you* will be responsible for the costs in excess of the maximum allowable charge, in addition to *your* applicable cost sharing amount.

**LIMITATION ON SELECTION OF PHARMACIES:** If *we* determine that *you* may be using *prescription drugs* in a harmful or abusive manner, or with harmful frequency, *we* may require *you* to select a *member pharmacy* to provide and coordinate all future prescription services. If *you* do not make a selection within 31 days of the date that *we* notify *you, we* will assign *you* a single *member pharmacy.* Benefits will be paid only when *you* use the assigned pharmacy.

**NO ASSIGNMENT OF BENEFITS:** Benefits payable for drugs dispensed by a non-*member pharmacy*, or by a *member pharmacy* without using a *prescription drug card*, will not be assignable unless *we* are required by the laws of the state where *you* live to accept all benefit assignments. Otherwise, any assignment or attempted assignment of these benefits will be void.

**COUPONS:** The value of any manufacturer coupons may not apply to the applicable *prescription drug copayment amount*, *deductible amount, coinsurance percentage*, and/or *network* out-of-pocket maximum. *You* may access information on which coupons or offers are not permitted through the Internet at www.myuhone.com or by calling the telephone number on *your* health insurance identification card.

**EXCLUSIONS AND LIMITATIONS:** No benefits will be paid under this rider for expenses incurred:

A. For any medication that is used for the treatment of erectile dysfunction or sexual dysfunction, unless *medically necessary*.

B. For immunization agents, blood, or blood plasma.

C. For medication that is to be taken by the *covered person*, in whole or in part, at the place where it is dispensed.

D. For medication received while the *covered person* is a patient at an institution that has a facility for dispensing pharmaceuticals.

E. For a refill dispensed more than 12 months from the date of a *doctor's* order.

F. Due to a *covered person's* addiction to, or dependency on, tobacco or foods.

G. For more than the predetermined *managed drug limitations* assigned to certain drugs or classification of drugs.

H. For a *prescription order* that is available in over-the-counter form, or comprised of components that are available in over-the-counter form, and is *therapeutically equivalent*.

I. For drugs labeled "Caution - limited by federal law to investigational use," or for investigational or experimental drugs.

J. For a *prescription drug* that has (an) active ingredient(s) that is/are:

1. Available in and *therapeutically equivalent* to another covered *prescription drug*; or

2. A modified version of and *therapeutically equivalent* to another covered *prescription drug*.

Such determinations may be made up to six times during a calendar year, and *we* may decide at any time to reinstate benefits for a *prescription drug* that was previously excluded under this paragraph.

K. For *ancillary charges*.

L. In excess of the maximum allowable charge paid for a *therapeutic class* of/*therapeutically equivalent prescription drugs*.

M. For *prescription drugs* dispensed in excess of the supply limit assigned.

N. For compounded drugs that:

1. Do not contain at least one ingredient that has been approved by the U.S. Food and Drug Administration (FDA) and require a *prescription order* or refill.

2. Contain a non-FDA approved bulk chemical.

3. Are available as a similar commercially available *prescription drug*.

O. For a *prescription drug* with an approved *biosimilar* or a *biosimilar* and *therapeutically equivalent* to another covered *prescription drug*. Such determinations may be made up to six times during a calendar year.

P.  For certain *prescription drugs* for which there are *therapeutically equivalent* alternatives available, unless required by law or approved by *us*. Such determinations may be made up to six times during a calendar year.

Q.  For diagnostic kits and products.

R.  For publicly available software applications and/or monitors that may be available with or without a *prescription order* or refill.

S.  For any product for which the primary use is as a source of nutrition, nutritional supplement, or dietary management of disease; and for prescription medical food products even when used for the treatment of *illness* or *injury*, except as required by state law.

T.  For dental products, including but not limited to, prescription fluoride topicals.

**DEFINITIONS:**

*"Ancillary charge"* means the additional charge incurred by the *covered person* when two drugs are *chemically equivalent* and the higher-tiered drug of the two is dispensed. In addition to the *prescription drug copayment amount*, if any, that applies to the lower-tiered drug, the *covered person* is responsible for an ancillary charge of the difference between the cost of the lower-tiered drug and the higher-tiered drug dispensed. The *ancillary charge* does not apply to the *network* out-of-pocket maximum.

*"Biosimilar"* means a biological *prescription drug* approved by the U.S. Food and Drug Administration (FDA) based on showing that it is highly similar to a reference product (a biological *prescription drug)* and has no clinically meaningful differences in terms of safety and effectiveness from the reference product.

*"Brand-name drug"* means a *prescription drug* that:

A.  Is manufactured and marketed under a trademark or name by a specific drug manufacturer; or

B.  *We* identify as a brand-name product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. A drug identified as a "brand-name" by the manufacturer, pharmacy, or *your* physician may not be classified as a *brand-name drug* by *us*.

*"Chemically equivalent"* means that *prescription drugs* contain the same active ingredient.

*"Designated pharmacy"* means a pharmacy that has entered into an agreement with *us* or with *our* pharmacy benefits manager to provide specific *prescription drugs*, including, but not limited to, *specialty prescription drugs*. The fact that a pharmacy is a *member pharmacy* does not mean that it is a *designated pharmacy*.

*"Generic drug"* means a *prescription drug* that:

A.  Is *chemically equivalent* to a *brand-name drug;* or

B.  *We* identify as a generic product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. A drug identified as a "generic" by the manufacturer, pharmacy, or *your* physician may not be classified as a *generic drug* by *us*.

*"Managed drug limitations"* means limits in coverage based upon time period, amount, or dose of a drug, or other specified predetermined criteria.

*"Member pharmacy"* means a licensed pharmacy that has entered into a contract with *our* pharmacy benefits manager to provide *prescription drugs* to *covered persons* at a negotiated rate.

*"Prescription drug"* means any medicinal substance whose label is required to bear the legend "RX only."

*"Prescription drug copayment amount"* means the amount to be deducted from the total *covered expense* incurred for each separate *prescription order*.

*"Prescription order"* means the request for each separate drug or medication by a *doctor* or each authorized refill of such requests.

*"Specialty prescription drug"* means *prescription drugs* that are generally high cost, self-injectable biotechnology drugs used to treat patients with certain *illnesses*. *You* may access a complete list of *specialty prescription drugs* by accessing *your prescription drug* benefits on *our* website or by calling the telephone number on *your* health insurance identification card.

*"Therapeutic class"* means a group or category of *prescription drugs* with similar uses and/or actions.

*"Therapeutically equivalent"* means that two or more *prescription drugs* can be expected to produce essentially the same therapeutic outcome and toxicity.

This rider will not change, waive or extend any part of the *policy*/certificate, other than as stated herein.

**Golden Rule Insurance Company**

**President**

**EXHIBIT "B"**

# Golden Rule®

A UnitedHealthcare Company

7440 Woodland Drive
Indianapolis, IN 46278-1719

For Inquiries: (800) 657-8205

In this certificate, *"you,"* or *"your"* will refer to the *primary insured* named below, and *"we," "our"* or *"us"* will refer to Golden Rule Insurance Company, a stock company. Defined terms are in italics.

## AGREEMENT AND CONSIDERATION

*We* certify that, as of the applicable *effective date* shown in the Data Page, *you* became insured under the group insurance *policy*. *We* will pay benefits for a *loss* as set forth in the *policy*. This certificate is issued in exchange for and on the basis that the information shown on *your* application is correct and complete. Therefore, PLEASE READ YOUR APPLICATION. If it is not complete or has an error, please let *us* know. An incorrect or incomplete application may cause *your* certificate to be voided or claims to be reduced or denied. All provisions, limitations, and exclusions of the group insurance *policy* apply to the insurance evidenced by this certificate, even if not mentioned in this certificate.

## POLICY TERM AND NONRENEWABILITY

The premium *you* paid put this certificate in force as of the *effective date* shown in the Data Page. It will stay in force until the termination date shown in the Data Page, subject to receipt of premiums and cancellation for fraud. The *policy term* will begin and end at 12:01 A.M., where *your residence* is located. This certificate cannot be renewed beyond the termination date listed in the Data Page.

## 10-DAY RIGHT TO EXAMINE AND RETURN THIS CERTIFICATE

Please read this certificate. If *you* are not satisfied, *you* may notify Golden Rule within 10 days of the date *you* received it. Premium paid will be refunded, less claims paid. Coverage under this certificate shall be voided as if coverage had never been issued.

*[signature]*                                          *[signature]*

                                                              President

### Short Term Medical Expense Certificate

**Upon timely payment of premiums, coverage will remain in force until the termination date shown in the Data Page, subject to cancellation for fraud in the submission of a claim.**

NOTICE: IF YOU OR YOUR FAMILY MEMBERS ARE COVERED BY MORE THAN ONE HEALTH CARE PLAN, YOU MAY NOT BE ABLE TO COLLECT BENEFITS FROM BOTH PLANS. EACH PLAN MAY REQUIRE YOU TO FOLLOW ITS RULES OR USE SPECIFIC DOCTORS AND HOSPITALS, AND IT MAY BE IMPOSSIBLE TO COMPLY WITH BOTH PLANS AT THE SAME TIME. READ ALL OF THE RULES VERY CAREFULLY, INCLUDING THE COORDINATION OF BENEFITS SECTION, AND COMPARE THEM WITH THE RULES OF ANY OTHER PLAN THAT COVERS YOU OR YOUR FAMILY.

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

GRI-STAG20-C-P-D-34

ST
10/1/20

# TABLE OF CONTENTS

This table of contents is provided as a general guide to the major sections of the certificate. The section headings will not affect the validity, construction or effect of the *policy* provisions.

**Section**

DATA PAGE...................................................................................................................................................... 1

    This section is a summary of the specific benefits that apply to *you* and *your* covered *dependents.*

GENERAL DEFINITIONS................................................................................................................................ 2

    All *italicized* words are defined, either here or in the provision in which they are used.

POLICYHOLDER PROVISIONS...................................................................................................................... 3

    These provisions will affect *your* group insurance coverage. Premium, *policy* termination and notice are some of the provisions in this section.

ELIGIBILITY................................................................................................................................................... 4

    This section lists eligibility requirements for *you* and any *dependents.*

GENERAL PROVISIONS................................................................................................................................ 5

    This section includes a person's *effective date* and termination of coverage.

BENEFIT PROVISIONS.................................................................................................................................. 6

    This section details the benefits provided under this coverage.

GENERAL EXCLUSIONS and LIMITATIONS................................................................................................. 7

    Read carefully and note that each benefit provision may have specific exclusions and limitations.

SPECIAL CONDITIONS and PROVISIONS.................................................................................................... 8

    Some of the provisions in this section are *preexisting conditions*, and coordination of benefits.

UNIFORM PROVISIONS................................................................................................................................ 9

    This section includes many provisions required by law, including claims procedures.

.

**Section 1**

# DATA PAGE

**Master Policy** - GO-USTAG20
**Policyholder** - FACT

**Certificate Number -** 096-613-236
**Primary Insured -** Shawn L Frazier
**Plan -** Husband - Wife
**Policy Term -** one day less than 12 months

**EFFECTIVE DATE** (at 12:01 a.m. on)................................................................ January 12, 2022

**TERMINATION DATE** (at 12:01 a.m. on):..........................................................January 11, 2023*
    *The grace period will never extend beyond this termination date.

**IMPORTANT: If** *covered expenses* **are incurred at a non-***network provider***, benefits will be less than the amount which would have otherwise been payable at a** *network provider*. *Network providers* **have agreed to discounted pricing for** *covered expenses* **with no additional billing to** *you* **other than** *deductible amounts*, *copayment amounts***, and coinsurance. Non-***network providers* **may bill** *you* **for any amount up to the billed charge.**

**AMOUNT PAYABLE**
    **Maximum Benefit Limit**
        Per *covered person*, per *policy term*.................................................................. $2,000,000

**DEDUCTIBLE AMOUNT** - per *covered person*, per *policy term*

    **Network Provider**........................................................................................................$5,000

        Maximum number of *covered persons* required to pay the *network provider*
        *deductible amount*, per family, per *policy term*............................................................Two

        Unless otherwise stated, the *network provider deductible amount* will not apply to
        *covered expenses* subject to a *copayment amount*.

    **Non-Network Provider** (including *covered expenses* credited to the *network*
    *provider deductible amount*)........................................................................................... $10,000

**COINSURANCE PERCENTAGE**
    For *eligible expenses* in excess of the applicable *deductible amount*....................................0%
    (Not applicable to *covered expenses* subject to a *copayment amount,* unless otherwise
    specifically stated)

**NETWORK COINSURANCE OUT-OF-POCKET MAXIMUM**, per *covered person*,
per *policy term*............................................................................................................ $0

There is no out-of-pocket maximum limit for non-*emergency covered expenses* incurred at non-*network providers*.

**NON-NETWORK PROVIDER BENEFITS**
    *Covered expenses* do not include amounts in excess of the *eligible expense*. Non-*emergency
    non-network eligible expenses* will be reduced by 25% before application of any applicable
    *deductible amounts* and *coinsurance percentage*. This means, for example, $100 of *non-
    network eligible expenses* will be considered as $75 in *eligible expenses* for purposes of
    determining benefits. These reduced *non-network eligible expenses* will then be subject to
    any applicable *deductible amounts* and *coinsurance percentage*.

**BENEFIT LIMITS/SPECIFICS**

**EMERGENCY ROOM DEDUCTIBLE** (for each visit) for *injury* or *illness* to an *emergency* room when the *covered person* is not directly admitted to the *hospital*............................................. $500

> Note: After satisfaction of the *emergency* room deductible, *covered expenses* are subject to any applicable *deductible amount* and *coinsurance percentage*.

**NETWORK PROVIDER COPAYMENT AMOUNTS**

**URGENT CARE:** *Copayment amount* per occurrence at an *urgent care center*.................. $50

**OUTPATIENT PRESCRIPTION DRUGS**

**Tier 1**, *prescription drug copayment amount* per *prescription order* or refill................... $25

> The *prescription drug copayment amount* applies only when a health insurance identification card is used at a *member pharmacy*.

**Tiers 2, 3, and 4,** will be subject to the applicable *deductible amount* and *coinsurance percentage.*

**Maximum Outpatient Prescription Drugs Covered Expenses,**
per *covered person*, per *policy term*........................................................................ $5,000

NOTE: Tier status for a *prescription drug* may be determined by accessing *your prescription drug* benefits via *our* website or by calling the telephone number on *your* health insurance identification card. The tier to which a *prescription drug* is assigned may change as detailed in the Outpatient Prescription Drug Expense Benefits Rider.

No benefits are payable for expenses in excess of the cost of the *generic drug* when a *brand-name drug* is purchased and the *generic drug* is available.

If a *generic drug* becomes available for a *brand-name drug,* the tier placement of the *brand-name drug* may change, and *your* cost sharing may change and an *ancillary charge* may apply.

"*Generic drug*" means a *prescription drug* product: (1) that is *chemically equivalent* to a *brand-name drug;* or (2) that *we* identify as a generic product based on available data resources including, but not limited to, Medi-Span, that classify drugs as either brand or generic based on a number of factors. *You* should know that all products identified as a "generic" by the manufacturer, pharmacy or *your* physician may not be classified as a *generic drug* by *us*.

**SPINE AND BACK DISORDERS.....** *Covered expenses* limited to *inpatient* and surgical treatment

**AIR AMBULANCE**

Maximum *covered expenses*, per *covered person*, per *policy term*................................. $5,000

**INPATIENT HOSPITALIZATION**

Daily Hospital room and Board
and Nursing Services Limit.................................................... Most Common Semi-Private Rate

Intensive Care Unit Limit.............................................................................. *Eligible Expenses*

**We may from time to time negotiate fee discounts with health care professionals and facilities. Benefit calculations will be based upon the discounted price, if any.**

**Ohio**

## APPLICATION FOR SHORT TERM MEDICAL INSURANCE
## GOLDEN RULE INSURANCE COMPANY
## INDIANAPOLIS, INDIANA 46278-1719

**Please list only those persons needing coverage.**

### Applicant(s) Information

| Gender | Name (Last, First, M.I.) | Birth Date* | MUST BE ACCURATE** | |
|---|---|---|---|---|
| | | | Height | Weight |
| ☑ Male ☐ Female | Primary (You)   Frazier    Shawn    L | 07 28 64 | 5' 8" | 175 |
| ☐ Male ☑ Female | Spouse   Frazier    Denise    M | 06 04 65 | 5' 6" | 184 |
| ☐ Male ☐ Female | Child 1 | | | |
| ☐ Male ☐ Female | Child 2 | | | |
| ☐ Male ☐ Female | Child 3 | | | |
| ☐ Male ☐ Female | Child 4 | | | |

*If born within 30 days prior to the effective date of coverage, the person will not be covered under the policy/certificate.

**Applicants must meet our height and weight guidelines to qualify for coverage.

### Resident Physical Address (where you live and pay taxes). PO Boxes are not accepted.

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| 7517 BROOKS RD | HARRISON | OH | 45030 |

### Mailing Address (if different than Resident Address)

| Street (Include Apt.) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

### Payor (if not you)

| Name (Last, First, M.I.): | Relationship to Primary | | |
|---|---|---|---|
| | ☐ Relative ☐ Other (Specify):_____ | | |
| Street (Include Apt.) | City | State | ZIP Code |
| | | | |

### Contact Information

| | Phone Number | Email | Applicant |
|---|---|---|---|
| **Primary (You)** | 513 367-1510 ☑ Check if not a mobile phone. | denisefrazier@zoomtown.com | |
| **Spouse** | 513 675-5584 | denisefrazier@zoomtown.com | |
| **Dependent Child age 18 and over** | | | |
| **Dependent Child age 18 and over** | | | |
| **Payor (if not you)** | - | | |

## Plan Selection

| Requested Effective Date: 01 / 12 / 2022 | Months of Coverage: 12 |
|---|---|
| *(See Statement of Understanding section)* | *(minimum 1 month, maximum 1 day less than 12 months)* |

| Plans *(Choose one plan)* | | | | |
|---|---|---|---|---|
| | ☐ Premier Elite | 100/0 - $0 | ☐ **Value** | 70/30 - $10,000 |
| | ☑ **Plus Elite** | 100/0 - $0 | ☐ **Hospital & Surgical** | 50/50 - $10,000 |
| | ☐ **Plus** | 80/20 - $2,000 | | |
| | ☐ **Copay** | 80/20 - $5,000 | | |
| Deductible Amount *(Choose one)* | ☐ $2,500  - Available for Plus Elite, Plus, Copay, and Value plans only | | | |
| | ☑ $5,000  - Available for all plans | | | |
| | ☐ $7,500  - Available for Plus Elite, Plus, Copay, Value, and Hospital & Surgical plans only | | | |
| | ☐ $10,000 - Available for Premier Elite, Plus Elite, and Copay plans only | | | |
| | ☐ $14,000 - Available for Premier Elite only | | | |
| | ☐ $15,000 - Available for Plus Elite, Plus, Copay, Value, and Hospital & Surgical plans only | | | |

## Optional Benefits Selection

| Supplemental Accident Benefit | ☐ $2,500   ☐ $5,000   ☐ $7,500   ☐ $10,000   ☐ $15,000 |
|---|---|
| Virtual Care Rider | ☐ |

## Application Questions

| | General Information | Yes | No |
|---|---|---|---|
| G1 | During the past 5 years, has any applicant been declined for insurance by a carrier other than Golden Rule Insurance Company due to health reasons? <br> If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 <br> The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| G2 | Has any applicant lived in the 50 states of the USA or the District of Columbia for **less than** the past 12 months? <br> If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 <br> The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| G3 | During the past 12 months, has any applicant smoked cigarettes or e-cigarettes or used tobacco in any form (including smokeless tobacco) or nicotine substitute? <br> If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 | ☐ | ☑ |
| | **Medical History Information** | **Yes** | **No** |
| M1 | Is any applicant currently pregnant, an expectant parent, in the process of adopting a child, or undergoing infertility treatment? <br> **If yes, coverage cannot be issued.** | ☐ | ☑ |
| M2 | Within the last 5 years, has any applicant received medical or surgical consultation, advice, or treatment, including medication, for **any of the following:** blood disorders, liver disorders, kidney disorders, chronic obstructive pulmonary disorder (COPD) or emphysema, diabetes, cancer, multiple sclerosis, heart or circulatory system disorders (excluding high blood pressure), Crohn's disease or ulcerative colitis, or alcohol or drug abuse or immune system disorders? <br> If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 <br> The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |

| **Application Questions (continued)** | | | |
|---|---|---|---|
| M3 | During the past 12 months, has any applicant been advised to undergo any test (except for HIV test), treatment, hospitalization, or surgery which has not yet been completed or for which results have not yet been received? If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| M4 | Within the last 5 years, has any applicant received a diagnosis or treatment for HIV infection from a doctor or other licensed clinical professional, or had a positive test for HIV infection performed by a doctor or other licensed clinical professional (excluding an initial positive result that further testing showed to be false)? If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| M5 | Note: Only answer the following question if applying for a Plus plan. Within the last 5 years, has any applicant received diagnosis, treatment, counseling, consultation, advice, or medication for any mental disorder or for alcohol or drug abuse? If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 The person(s) named will not be covered under the policy/certificate. | ☐ | ☐ |
| **Other Coverage Information** | | **Yes** | **No** |
| O1 | Does any applicant now have, or is any applicant currently applying for, other hospital or medical expense insurance that **will not** terminate prior to the requested effective date? (Other hospital or medical expense insurance does not include fixed indemnity insurance.) If yes, select each person: ☐Primary ☐Spouse ☐Child 1 ☐Child 2 ☐Child 3 ☐Child 4 The person(s) named will not be covered under the policy/certificate. | ☐ | ☑ |
| **For Applicants with Current Short Term Medical Coverage With Us** | | **Yes** | **No** |
| S1 | Does any applicant currently have short term limited duration medical insurance coverage with Golden Rule Insurance Company that **not** terminate prior to the requested effective date? If yes, please answer question a below. | ☐ | ☑ |
| | a. Do you want to terminate the current short term medical coverage the effective date of the new policy/certificate, if issued?  If yes: i. Any illness, injury, or condition that began during the current coverage will be considered a preexisting condition under the new policy/certificate and may not be covered; and ii. Any deductible amount, coinsurance percentage and other amounts paid by you under your current coverage do **not** count toward the new policy/certificate. If you answer no to question S1a, the effective date of the new policy/certificate, if issued, will be the date your current short term medical coverage terminates. | ☐ | ☐ |

This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your policy/certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your policy/certificate might also have lifetime and/or annual dollar limits on health benefits. If this coverage expires or you lose eligibility for this coverage, you might have to wait until an open enrollment period to get other health insurance coverage.

## Statement of Understanding

I have read this application and represent that the information shown on it is true and complete. I understand that:

(1) No insurance will become effective unless my application is approved and the appropriate premium is actually received by Golden Rule with this application.

(2) No benefits will be paid for a health condition that exists prior to the date insurance takes effect.

(3) If coverage is issued, the coverage will not be a continuation of any prior coverage.

(4) Incorrect or incomplete information in this application may result in voidance of coverage and claim denial.

(5) The information provided in this application, and any supplement or amendments to it, will be made a part of any policy/certificate that may be issued.

(6) If my application is approved, insurance will be effective the later of: (a) the requested effective date, or (b) the effective date approved by Golden Rule.

(7) If other short term limited duration medical insurance is still active with Golden Rule for any applicant on that effective date, then the effective date of the new coverage, if issued, will be the date the current short term medical coverage terminates unless otherwise indicated in this application.

(8) The producer is only authorized to submit the application and initial premium and may not change or waive any right or requirement.

(9) If I have provided a phone number, Golden Rule may provide a welcome call. If I have provided a mobile phone number, Golden Rule may also text me (a) prior to the end of my short term medical coverage, (b) if my coverage lapses, and/or (c) if my premium is past due.

## Signature Information

| Proposed Insured (or Parent/Legal Guardian if Proposed Insured is a child) | Signature | Date Signed | | |
| --- | --- | --- | --- | --- |
| | Shawn L Frazier (esign) | 01 | 11 | 22 |

**Important Notes:**
- No application will be accepted if received by Golden Rule more than 15 days after the date signed.
- Altered applications will not be accepted.
- The state of Ohio requires that we provide you with the following information: Any person who, with the intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

## Payment Options: Single Payment or Monthly Payment

Electronic Funds Transfer (EFT) and Credit Card payments will be collected at the time of application. Premium will be verified and may be adjusted up or down during the processing of your application. Please select your payment option and then complete the authorization below. Amounts include monthly $10 FACT fee.

☐ Single Payment (one single payment for all months of coverage chosen):

    ☐ EFT

    ☐ Credit Card

        Amount $_____

OR

☑ Monthly Payment:

    ☑ EFT

    ☐ Credit Card

        Amount $ 781.87

## Electronic Funds Transfer Authorization - Complete only if paying by EFT

I (we) hereby authorize FACT or Golden Rule Insurance Company to initiate debit entries to the account indicated below. I also authorize the named financial institution to debit the same to such account.

I agree this authorization will remain in effect until you actually receive written notification of its termination from me.

Type of Account: ☐ Checking  ☐ Savings

Nine-digit Routing No. _____  Account No. _____

Financial Institution's Name _____

Address _____

City, State, ZIP _____

Draft On    12       2022-01-11
         Day          Date Signed
       Only select a draft date between the 1st and 28th of the month.

In Tennessee and Texas, drafts may only be scheduled on 1) the premium due date; or 2) up to 10 days after the due date.

X **Shawn L Frazier (esign)Authorized User**
   Authorized Account Signature

## Credit Card Authorization - Complete only if paying by Credit Card

I authorize FACT or Golden Rule Insurance Company to bill my American Express/MasterCard/Visa/Discover account for the Single Payment or Monthly Payment above.

Type of Card: ☐ MasterCard  ☐ Visa  ☐ American Express  ☐ Discover    Exp. Date: _____
                                          Month     Year

Billing ZIP Code: _____  Card Number _____

X _____    Charge On _____
  Signature of Authorized User                        Day
                          Only select a charge date between the 1st and 28th of the month.

Note: Some card issuers/financial institutions charge cash advance fees on insurance payments.

## CONSENT TO RECEIVE ELECTRONIC RECORDS AND TO CONDUCT TRANSACTIONS ELECTRONICALLY

By submitting this consent form or a health insurance application or HMO enrollment form, you hereby consent to presentation, delivery, storage retrieval and transmission of "Communications" related to "Our Transaction" as electronic records instead of in paper form.

For the purposes of this form, "Our Transaction" means the entirety of the business relationship between you and us. "Communications" includes, but is not limited to:

1. Your application or enrollment form, including subsequent amendments;
2. Information related to Our Transaction that we are required to provide or make available in writing such as privacy notices or fraud warnings;
3. Documents related to Our Transaction such as policy, certificate, or evidence of coverage forms, claim forms, explanation of benefit forms, premium notices or privacy policies and notices (e.g., HIPAA Notices or Privacy Practices) or other administrative forms (to the extent permitted by applicable law);
4. Any emails, faxes, recorded telephone calls, or other electronic transmissions of information between you and us and an insurance producer contracted with us, or between us and any third party.

Subject to our obligations to protect your privacy, we may, at our sole discretion, post Communications on a website (in which case they will be sent or received, as the case may be, regardless of whether or not we own, operate or control the website). Or send them in or attached to an email. Please be advised that communication by unencrypted email presents a risk of disclosure to, or interception by, unintended third parties. You must promptly tell us about any change to your electronic or physical mailing address, or other contact information.

You acknowledge that you can receive or access Communications because you have the following:

- A telephone
- A computer and printer
- A device or computer program for listening to audio CDs, mp3, WAV or other common computer audio files
- An Internet browser
- Access to the Internet
- A valid email address
- Adobe Acrobat Reader or other sufficient PDF reader

You can request a free copy of any Communications, or withdraw your consent to receive electronic Communications at any time by sending a written request to:

**Policy Administration**
**PO Box 31372**
**Salt Lake City, UT 84131-0372**

☑ I hereby consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. All of the Communications between the time you submit your consent and withdraw your consent will remain valid and binding on both you and us notwithstanding your withdrawal.

☐ I hereby DO NOT consent to receive Communications and Transaction Documents electronically, as per the aforementioned conditions. If you do not consent, we will conduct all future business with you in paper form.

X Shawn L Frazier (esign) _____    X _____
Primary Applicant *(You)*                Parent/Guardian *(if you are a minor)*    Relationship

denisefrazier@zoomtown.com
_____       _____
Primary Applicant *(You)* Email Address     Parent/Guardian *(if you are a minor)* Email address

01  11  22                                         096613236
_____       _____
Date                                     Policy ID Number

44177a-X-1020
448I-G-1221
7 of 7

EXHIBIT "C"

**GoldenRule**®
A UnitedHealthcare Company
PO Box 31374
Salt Lake City, UT 84131-0374

June 10, 2022

DENISE FRAZIER
7517 BROOKS RD
HARRISON      OH 45030-8552

Identification No: 096613236
Insured: Shawn Frazier
Claimant: Denise Frazier
Denial Reason(s): Preexisting and Rescission
Contract Provision(s): Preexisting Condition Provision & Material Misstatement
Provision

Dear Mrs. Frazier:

Your request for benefits has been reviewed very carefully. We want to let you know
the result of our review.

**The Application for Coverage:**

Before we can issue health insurance coverage, a customer fills out an application. We
use the application to determine if we can offer coverage and rely on this information
when we agree to provide coverage for a customer.

If the application is approved, a copy of it is attached and made part of the plan. We do
this so the customer can check the answers and let us know if any information is
missing or incorrect.

On the front of the plan, it says "**Check the attached application.** If it is not complete
or has an error, please let *us* know. An incorrect or incomplete application may cause
your policy to be voided and claims to be reduced or denied."

**New Information from Our Review:**

During our review, we requested and received medical records from David Hess, Jane
Blinzer, Mercy Health West Hospital, Jewish Hospital, The Good Samaritan Hospital,
The Little Clinic and MMA Colorectal Surgery. These medical records indicate that
information was incorrect or missing from your application. This information would
have changed the original decision to issue coverage.

According to the information we received, the answer to Question(s) M2 and M3
should have been "Yes" with respect to your medical history. A copy of the application

is enclosed for your review.

The records we received indicate that on July 28, 2020, you were prescribed Xarelto for phlebitis of leg.

Also, on January 10, 2022, you received a referral for GI, which was not completed at the time of her application.

There may be additional information that was missing or incorrect on your application. Golden Rule reserves the right to assert any other material misstatements as reasons to void your coverage. By taking this action, we are not waiving any rights under the provisions of the plan, including, but not limited to, the Preexisting Conditions exclusion provision.

## How the New Information Will Affect Your Coverage:

If this information had been shown on your application for insurance, your policy would not have been issued in its present form. A rider would have been placed on your policy. The rider would have excluded you from all coverage.

Now that this medical history is known, we are allowing you the option of retaining your coverage with the acceptance of the aforementioned rider on Denise Frazier. Or, if you prefer, we are willing to void your policy from the beginning and refund all premiums paid less any claim payments already made, if any.

In order to conclude this matter, please respond to us with your decision within the next 30 days.

If you choose to accept the aforementioned rider, sign and return the original Rider-Amendment to us. The additional copy of the Rider-Amendment should be attached to your policy.

If you choose to accept the rider, the claim submitted for you will be denied.

## Preexisting Conditions

Preexisting conditions are not covered under your plan. To assist us in determining whether or not your claims were for preexisting conditions, we had your medical records reviewed

by a qualified doctor. A copy of the doctor's opinion is enclosed with the doctor's name omitted for confidentiality purposes.

Based on the medical history, the treatment listed in the enclosed opinion and all related expenses are due to a preexisting condition(s) as defined by your plan. Therefore, had you been otherwise insurable, these expenses would not have been covered in accordance with your contract provisions.

**30 Day Notice**

If you choose to have your policy voided, please notify us of this decision within the next 30 days.

We are required to provide to you this 30-day notice before proceeding with the rescission of coverage. During this 30-day period, we will continue to collect premium. You may submit any additional information that you would like us to review to reconsider our determination on your case. We will not deny any claims during this 30-day period. This 30-day period also allows you the time to seek coverage elsewhere.

In the absence of a reply, we will have no alternative but to void all coverage for you and your spouse. This means it is as though coverage had never been approved or issued. We will return any premium due, and we will not provide coverage or pay any claims.

In the meantime, further processing of all claims under your policy will be suspended until we receive your response.

If you would like us to reconsider our decision on this matter, please submit any additional information or documentation to us for further consideration.

**Right to Appeal**

You have the right to appeal this decision. If you wish to file an appeal, please send us your written request, along with any additional information you would like us to review, to the address below. You do not have to provide us with any additional information in order to appeal this determination. Your file will remain open while the appeal is conducted.

Grievance Administrator
PO Box 31371
Salt Lake City, UT 84131-0371

You have the right to receive, upon request and free of charge, a copy of the internal rule, guideline, or protocol that we relied upon in making the non-coverage decision for your claims. To request copies, please write to us at the address at the top of this letter.

You may have a right to file a civil action under state or federal law if all required reviews of your claim have been completed.

If you have any questions regarding this matter, please contact me at (800) 657-8205.

Sincerely,


*Joan Halstead*
Medical History Review Department

Enclosures

**EXHIBIT "D"**



UnitedHealthcare
Golden Rule Insurance Co.

August 23, 2022

MS DENISE M FRAZIER
7517 BROOKS RD
HARRISON OH 45030-8552

| Insured Name: | Shawn L. Frazier |
| Patient Name: | Denise M. Frazier |
| Date of Birth: | June 4, 1965 |
| Identification Number: | 096613236 |

Re: Grievance Review

Dear Ms. Frazier:

We received your request for review dated June 24, 2022.

Your letter indicates you believe the following:
- Golden Rule was given incorrect information from Cincinnati GI. The colonoscopy received in March of 2022, was a routine colonoscopy. It was done 5 years, to the date of the previous one.
- You only took the first fill of medication prescribed for leg thrombosis.
- The medical records from Dr. J. Blinzler's office are not correct. You do not have type 2 diabetes. You have not been treated or received any medication for type 2 diabetes.
- You did not answer 2 questions correctly, when you applied for this insurance. It was an honest mistake.

Additionally, Cincinnati GI sent a note to us regarding your March 4, 2022, claim and included your medical records for this date of service.

A review of your request has been conducted by a panel of persons not previously involved in this decision. The panel review was held on August 9, 2022. The panel's decision is to affirm our original decision to exclude you from coverage.

Short Term medical plans, such as the plan you applied for with Golden Rule, do not fall under the Affordable Care Act (ACA) requirements with regard to being guarantee issue. Short Term medical plans are designed to provide temporary coverage for healthy individuals and do no cover preexisting conditions. Our guidelines provide that applicants only qualify if all health questions on the application are marked "no" and the applicant meets our standard height and weight guidelines. We do not request medical records on our Short Term Medical plans, we rely on the information the applicant provides. When you completed the application, you attested that all information was true and complete. Since all medical questions were marked "no" on the application, you were issued the Short Term Medical coverage.

Golden Rule Insurance Company, a UnitedHealthcare company, is the underwriter and/or administrator of plans issued by it or its affiliates.

PO Box 31371, Salt Lake City, UT 84131-0371, (800) 657-8205

Ms. Denise M. Frazier
Identification Number: 096613236
August 23, 2022
Page 2 of 4

During our review, we requested and received medical records from David Hess, Jane Blinzler, Mercy Health West Hospital, Jewish Hospital, The Good Samaritan Hospital, The Little Clinic and MMA Colorectal Surgery. The records indicate that on July 28, 2020, you were prescribed Xarelto for phlebitis of leg. Also, on January 10, 2022, you received a referral to GI, which was not completed at the time of your application.

Question M2 on your Short Medical Term application asks, within the last 5 years, has any applicant received medical or surgical consultation, advice, or treatment, including medication, for any of the following: heart or circulatory system disorders (excluding high blood pressure). You answered this question "no". However, due to your medical records documenting that on July 28, 2020, you were prescribed Xarelto for phlebitis of leg, question M2 should be "yes". Had we known of this, we would not have offered you the Short Term Medical coverage.

Question M3 on your Short Medical Term application asks, during the past 12 months, has any applicant been advised to undergo any test (except for HIV test), treatment, hospitalization, or surgery which has not yet been completed or for which results have not yet been received. You answered this question "no". However, due to your medical records documenting on January 10, 2022, that you received a referral to GI, which was not completed at the time of your application, question M3 should be "yes". Had we known of this, we would not have offered you the Short Term Medical coverage. We have enclosed a copy of your Short Term Medical application for your review.

Additionally, as we explained in our letter dated June 10, 2022, a preexisting conditions review was done by a qualified doctor and we provided a copy of that review to you. It was the panel's decision to affirm all of the preexisting conditions listed in the review. A copy of your plan definition of preexisting conditions is enclosed for your review.

Since the panel has affirmed our action, we are still allowing Shawn L. Frazier, the option of retaining coverage by accepting the exclusionary rider for you. To do so, please sign and return the enclosed Rider-Amendment to Joan Halstead at P.O. Box 31370, Salt Lake City UT 84131-0370. The additional copy of the Rider-Amendment should be attached to your certificate.

In order to conclude this matter, please respond to us with the decision within the next 15 days. In absence of a reply, we will have no alternative but to void the coverage and refund all premiums. If you have any questions regarding this matter, please contact Joan Halstead directly at (800)657-8205.

The following information was taken into consideration during the review:
• Your appeal letter dated June 24, 2022.
• Cincinnati GI's note.
• Your Short Term Application for Insurance signed January 11, 2022.
• Your medical records from David Hess, Jane Blinzler, Mercy Health West Hospital, Jewish Hospital, The Good Samaritan Hospital, The Little Clinic and MMA Colorectal Surgery.

Attached is a chart providing details about the claims involved in this review. Related diagnosis and treatment codes, along with their meanings, for the dates of service reviewed as part of this appeal decision are available upon request.

Ms. Denise M. Frazier
Identification Number: 096613236
August 23, 2022
Page 3 of 4

You have the right to receive, upon request and free of charge:
- Reasonable access to, and copies of, all documents, records, and other information relevant to your benefit request;
- A copy of the internal rule, guideline, protocol, or other similar criterion that we relied upon in making the benefit decision for your claim; and
- The procedure and diagnosis codes, along with their meanings, for your claim.

Please send your written request for this information to my attention at the following address:

Grievance Administrator
PO Box 31371
Salt Lake City, UT 84131-0371
Fax: (801) 478-5463

The internal appeals process has been completed. If your claim has been denied based on a determination that you are not eligible to participate in the plan, a health care service is not a covered benefit, a plan exclusion or a benefit limitation applies, or your coverage is rescinded, you have the right to file a complaint with the Ohio Department of Insurance. ATTN: Consumer Affairs. 50 West Town Street, Suite 300. Columbus, OH 43215. (614)-644-2673, toll free in Ohio (800) 686-1526. Complaints may also be filed via the internet at http://insurance.ohio.gov.

We have enclosed a description of both the standard and expedited external review procedures; including information regarding how to initiate an external review and the opportunity to submit additional information. Items of note included in this description are:
- A written request for an external review must be submitted to the health plan issuer within 180 days after the date of the notice of final adverse benefit determination;
- If the covered person's treating physician certifies that the covered person has a medical condition for which the time frame for completion of a standard external review would seriously jeopardize the life or health of the covered person or would jeopardize the covered person's ability to regain maximum function, the covered person may file a request for an expedited external review;
- If the final adverse benefit determination concerns a health care service for which the covered person received emergency services, but has not been discharged from a facility, the covered person may request an expedited external review;
- If the final adverse benefit determination concerns denial of coverage based on a determination that the recommended or requested health care service or treatment is experimental or investigational, the covered person may file a request for an external review to be conducted, or if the covered person's treating physician certifies that the recommended or requested health care service that is the subject of the request would be significantly less effective if not promptly initiated, the covered person may request an expedited external review to be conducted.

Ms. Denise M. Frazier
Identification Number: 096613236
August 23, 2022
Page 4 of 4

There may be other resources available to help you understand the appeal process. For questions about your rights, this notice, or for assistance, you can contact your state's Consumer Assistance at:

Ohio Department of Insurance
ATTN: Consumer Affairs
50 West Town Street
Suite 300
Columbus, OH 43215

Phone numbers: (800) 686-1526/ (614) 644-2673
TDD number: (614) 644-3745
Fax number: (614) 644-3744

Contact ODI Consumer Affairs:
https://gateway.insurance.ohio.gov/UI/ODI.CS.Public.UI/Complaint.mvc/DisplayConsumer
ComplaintForm.
File a Consumer Complaint:
http://insurance.ohio.gov/Consumer/OCS/Pages/ConsCompl.aspx.

Please note that appeal deadlines have been extended until further notice due to COVID-19. You should visit myuhone.com for more information and additional notices about the deadline extensions and how they may apply to you.

You may have a right to file a civil action under state or federal law if all required reviews of your claim have been completed.

If you have any questions regarding this matter, please contact me at (317) 405-3133, fax at (801) 478-5463, or e-mail at uhoappealsandgrievances@uhc.com.

Sincerely,

*Laura Foster*

Laura Foster, Senior Appeal Representative
Appeals & Grievances Department

Enclosures:
- Short Term Medical application
- Definition of preexisting conditions
- Rider amendments
- Claim Chart
- Ohio Notice of Appeal and External Review Rights
- Authorization for Disclosure of Personal Information during External Review